RECEIPT # 33991

# ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

<table>
<tr><td>
FRANK P. SLATTERY, JR. AND<br>
LFC NO. 1 CORP., ON<br>
BEHALF OF THEMSELVES AND ON<br>
BEHALF OF ALL OTHER<br>
SIMILARLY SITUATED<br>
SHAREHOLDERS OF MERITOR<br>
SAVINGS BANK,<br><br>
        Plaintiff,<br><br>
        v.<br><br>
THE UNITED STATES OF<br>
    AMERICA,<br><br>
        Defendant.
</td><td>
)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td></tr>
</table>

**FILED**

MAY 4 1993

U.S. COURT OF
FEDERAL CLAIMS

Civil Action No. _____

<u>COMPLAINT</u> 93 - 280 C

For its complaint against defendant United States of America ("United States"), Plaintiffs Frank P. Slattery ("Slattery") and LFC No. 1 Corp. ("LFC") state as follows:

## NATURE OF THE CASE

1.   This is a suit to recover damages sustained by Meritor Savings Bank ("Meritor") of Philadelphia, Pennsylvania, and by Meritor's shareholders, resulting from the United States' abrogation and repudiation of its contractual obligations to Meritor, Meritor's predecessor-in-interest and its shareholders.

## JURISDICTION

2.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).

## PARTIES

3.   On December 11, 1992, when the Pennsylvania Secretary of Banking seized Meritor and appointed the Federal Deposit Insurance Corporation ("FDIC") receiver of the institution, Plaintiff

IN TESTIMONY WHEREOF, the Bank has caused this Subordinated Note to be
executed by its duly authorized officer on the day and year first above written.

THE PHILADELPHIA SAVING FUND SOCIETY

By: _____
Anthony J. Nocella
Executive Vice President – Finance

ATTEST:

_____

Slattery owned 190,400 shares of the institution's stock.  He was also a member of Meritor's Board of Directors from 1988 until the institution was seized.  Slattery brings this suit both as a shareholder's derivative action and as a class action on behalf of all individuals who were shareholders of Meritor as of December 11, 1992.

4.  LFC was incorporated in 1979 under the laws of the State of Delaware and has its principle place of business in Wilmington, Delaware.  At the time Meritor was seized, LFC owned 1,975,000 shares of the institution's stock.  LFC brings this suit both as a shareholder's derivative action and as a class action on behalf of all individuals who were shareholders of Meritor as of December 11, 1992.

5.  Meritor, one of the oldest savings banks in the country, was a stock savings bank organized in 1816 under Pennsylvania law. The 176 year-old institution operated under the name PSFS in southeastern Pennsylvania.  With more than $3.5 billion in assets, Meritor was, on information and belief, the largest savings bank in the country to be seized.

6.  For purposes of this action, the Defendant United States has acted through one of its agencies, the FDIC.  The FDIC was established under the Federal Deposit Insurance Act, as amended, for the purpose of, among other things, insuring the accounts of depositors of certain state and federal depository institutions. The agency also has been the primary federal regulator of state chartered savings banks.  In the instant action, FDIC was the primary federal regulator of Meritor, and also insured Meritor's

-2-

...ed Note, that all actions on the Bank's part required for the issuance and delivery of this Subordinated Note have been duly taken by the Bank, and that this Subordinated Note is a valid, binding and legal obligation of the Bank, enforceable in accordance with its terms.

(8) Governing Law. This Subordinated Note shall be governed by and construed in accordance with the substantive laws of the Commonwealth of Pennsylvania to the extent that Federal law (including statutes, regulations, rulings and interpretations of the Federal Government of the United States or any agency thereof does not control).

(9) Binding on Successors. This Subordinated Note shall be binding upon the Bank and its successors and assigns.

(10) Use as Collateral. This Note is ineligible as collateral for a loan by the Bank.

(11) Headings. The headings of the Sections of this Subordinated Note except the terms identified for definition in Section 1 are for convenience only and do not constitute a part hereof.

accounts up to $100,000 per depositor.

## SHAREHOLDERS' DERIVATIVE ACTION ALLEGATIONS

7.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

8.  Plaintiffs will fully and adequately represent the interests of all other shareholders of Meritor similarly situated in enforcing the rights of Meritor.

9.  Plaintiffs, through their attorneys, have made demand upon the FDIC, as receiver of Meritor, to bring this action on behalf of Meritor, but has received no response.

10.  It is futile to expect the FDIC, as an agency of the United States, to sue the United States.

## CLASS ACTION ALLEGATIONS

11.  The class of persons represented by plaintiffs in this action consists of all shareholders of Meritor as of December 11, 1992.  The exact number of the class is not known, but it is estimated at about 40,000 members.  The class is so numerous that joinder of all individuals is impracticable.

12.  Common questions of law and fact affect the rights of all members, and the relief sought is common to the entire class.

13.  The named plaintiffs are representative parties for the class, and are able to, and will, fairly and adequately protect the interests of the class.

14.  This action is properly maintained as a class action in as much as the questions of law and fact common to the members of the class predominate over any questions affecting only individual

(b) Event of Subordination. An Event of Subordination is any recei-
vership, conservatorship, reorganization, readjustment of debt, marshalling of
assets and liabilities or similar proceedings, any liquidation, or winding-up,
or relating to, the Bank, whether voluntary or involuntary.

(5) Change of Form. If the Bank, through merger, conversion, transfer of
any or substantially all of its assets and liabilities or otherwise, changes its
form so that it is not insured by the FDIC or any successor of the FDIC, then,
beginning on the effective date of any such change of form, the remaining por-
tion of the principal amount of the Subordinated Note shall be repaid monthly in
an amount equal to one forty-second (1/42) of the then remaining principal
balance; provided, however, that all principal and interest remaining unpaid on
the Maturity Date shall be paid in full.

(6) Books of Account. The Bank shall keep true books of record and
account in which full, true and correct entries in accordance with generally
accepted accounting principles shall be made of all dealings or transactions in
relation to the business and affairs of the Bank, and shall allow FDIC reason-
able access to, and copies of, such books and records whether or not the Bank
continues to be an insured bank in accordance with the Federal Deposit Insurance
Act, (12 U.S.C. § 1811 et seq.) to effect the purposes of this Subordinated
Note.

(7) Authority. The Bank represents and warrants that it is duly author-
ized under the laws of the Commonwealth of Pennsylvania to issue this Subordi-

members, and a class action is superior to other available methods for the fair adjudication of the controversy.

## BACKGROUND

15.  In or about March, 1982, Western Savings Fund Society of Philadelphia ("Western"), a savings bank with 20 branches throughout the Commonwealth of Pennsylvania and with assets of approximately $2.1 billion, was insolvent. At this time, Western's liabilities valued at fair market value exceeded its assets valued at fair market value by approximately $796 million.

16.  In light of Western's desperate financial condition, the FDIC, which was the primary federal regulator of Western, solicited proposals from other financial institutions to acquire the liabilities and assets of Western.

17.  On March 3, 1982, the FDIC held a meeting with representatives of financial institutions interested in acquiring Western. Attending on behalf of the regulators were William Isaac, FDIC Chairman; Quinton Thompson, FDIC Director of Bank Supervision Division; Ray Brennan and Anthony Walsh from the FDIC's Washington, D.C. and Philadelphia office staff; Thomas Desch and William Taylor from the Federal Reserve Board; John Bonner from the Office of the Comptroller of Currency. Ben McEnteer, Commissioner of Banks of the Commonwealth of Pennsylvania, was also in attendance.

18.  FDIC Chairman William Isaac acknowledged at this meeting that Western's financial troubles required drastic regulatory intervention, and that the FDIC would not allow Western to continue to operate unless it merged with a financially healthy bank or

-4-

(3) <u>Prepayment</u>. The Bank may, with the permission of the FDIC, pursuant to U.S.C. § 1828(i)(1), prepay the Subordinated Note in whole or in part, on at least fifteen (15) Business Days' notice to FDIC, specifying the date and amount of prepayment, and upon the payment of accrued interest on the amount prepaid to and including the date of prepayment; provided, however, that partial prepayments shall be in the amount of $500,000 or any integral multiple there-of.

(4) <u>Subordination</u>.

(a) <u>Generally</u>. The indebtedness of the Bank evidenced by this Subordinated Note, including any interest due thereon, shall be subordinate and prior in right of payment to its obligations to its depositors, its obligations under banker's acceptances and letters of credit, and its obligations to its other creditors (including but not limited to other banks holding liens on or rights of setoff against assets of the Bank) whether outstanding or hereafter incurred. Thus, if an Event of Subordination occurs, all such obligations shall be entitled to be paid in full before any payment shall be made on account of the principal of, or interest on, this Subordinated Note. After payment in full of all sums owing with respect to such obligations, the holder of this Subordinated Note, together with the holders of any obligations of the Bank expressly on a parity with this Subordinated Note, shall be entitled to be paid from the remaining assets of the Bank before any payment or other distribution, whether of cash, property, or otherwise, shall be made on account of any obligations of the Bank expressly subordinated to this Subordinated Note.

savings and loan association.  Isaac also cautioned the attendees to be vigilant in guarding the confidentiality of these discussions until after Western's status had been resolved.

19.  If the FDIC were unable to find a merger partner for Western, the agency recognized that it would have to seize and liquidate the institution.  The FDIC estimated that it would cost the agency approximately $696 million to pay off the insured depositors of Western.

20.  On March 25, 1982, in response to the FDIC's invitation, PSFS, Meritor's predecessor-in-interest, submitted a proposal to acquire Western in an FDIC-assisted merger.  PSFS at the time had 71 branches throughout the Philadelphia metropolitan area and more than $ 7.4 billion in total assets.

21.  On March 29, 1982, PSFS submitted to the agency a revised proposal.  As part of its proposal, PSFS demanded the FDIC provide to the institution (i) $112 million in the form of a floating rate, fully amortizing negotiable note with a maturity period of seven years; (ii) quarterly payments pursuant to an Income Maintenance Agreement equal to the difference between the "average cost of funds" and the respective "yields," as those terms are used in such agreement; (iii) a loan in the amount Western was indebted to the Federal Reserve Bank in exchange for a negotiable, non-amortizing, fully subordinated seven-year PSFS note, bearing interest, payable semi-annually, equal to the coupon yield equivalent on one-year Treasury bills auctioned immediately prior to the beginning of the semi-annual period, plus 50 basis points; (iv) a seven year, non-amortizing negotiable note of approximately $110 million in

-5-

(c) "Maturity Date" shall mean April 2, 1989.

(2) Principal Payment. Principal shall be due on April 2, 1989.

(3) Interest. Interest will accrue starting on April 3, 1982 until all principal hereunder has been paid in full.

(a)  Interest Rate. The Interest Rate for payment of interest on this note shall be determined semi-annually. With respect to each Six-Month Period, the Interest Rate shall be the average equivalent coupon issue yield on the U.S. Treasury's 52-week Bill auction held immediately prior to the beginning of such Six-Month Period, plus one-half of one percent (0.5%). The rate to be used for the first interest rate payment, due July 1, 1982, shall be 14.52%.

(b)  Payment of Interest. Interest will be calculated on a simple interest basis using the actual number of days elapsed during each Six-Month Period and a calendar year of 365 or 366 days, as applicable. The first interest payment shall be due on July 1, 1982 and shall include interest accrued from and including April 3, 1982, to and including June 30, 1982. Thereafter, interest payments for interest accrued during each Six-Month Period shall be due on the first day of the subsequent Six-Month Period. Notwithstanding the above, the last interest payment shall be due and payable on the same date that the last principal payment is due and payable under paragraph 1.

exchange for a PSFS subordinated capital note in the same amount and on the same terms as described in (iii), above.

22.   PSFS further conditioned any acquisition of Western on FDIC's agreement that "[t]he difference between the liabilities assumed and the total of the market value of the Western assets, less reserves, shall be treated as goodwill and amortized on a straight-line basis over 15 years."

23.   On April 2, 1982, PSFS and Western executed a Plan of Merger, Articles of Merger, Board of Directors' resolutions approving the merger, and submitted to the FDIC an application for the merger.

24.   Later that same date, the FDIC ordered that the application for merger be approved, and that such merger be consummated on April 3, 1982 at 1:00 P.M.  In its order, the FDIC expressly found "that action must be taken immediately in order to prevent [Western's] probable failure . . . ."

24.   On April 3, 1982, PSFS and FDIC entered into a Merger Assistance Agreement in connection with the PSFS-Western merger. (The Assistance Agreement is attached as Exhibit 1.)   In that agreement, the parties stipulated the following:

> That the Secretary of Banking of the Commonwealth of Pennsylvania determined that Western "is in an unsafe or unsound condition;"
>
> That "many" of Western's assets acquired by PSFS "have a market value of less than the carrying value on the books of Western ('book value');"
>
> That the FDIC "has determined that it is in the best interests of the public and the depositors and other creditors of Western to provide assistance to facilitate the Merger;" and

### THE PHILADELPHIA SAVING FUND SOCIETY

#### SUBORDINATED NOTE*

April 3, 1982                                                    $216,250,000.00

THE PHILADELPHIA SAVING FUND SOCIETY ("Bank"), an insured mutual savings bank organized under the laws of the Commonwealth of Pennsylvania and having its principal office in Horsham, Pennsylvania, for value received, hereby promises to pay to the FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"), a corporation duly organized under the laws of the United States, the sum of Two Hundred Sixteen Million Two Hundred Fifty Thousand Dollars ($216,250,000) plus interest on the unpaid principal amount thereof, pursuant to the terms and conditions set forth in the Subordinated Note Agreement of even date herewith between FDIC and the Bank and the terms and conditions hereinafter set out.

(1) <u>Definitions</u>.  For the purpose of this Subordinated Note:

(a) "Business Day" shall mean a day other than a Saturday, Sunday, Federal legal holiday, or legal holiday under the laws of the Commonwealth of Pennsylvania.

(b) "Six-Month Period" shall mean the six (6) month period of each year ending on June 30 and December 31.

* NOTE:  THIS OBLIGATION IS NOT A DEPOSIT AND IS NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION.

That the Board of Directors of the FDIC determined that the Assistance Agreement "will facilitate the Merger and will reduce the risk or avert a threatened loss to the FDIC."

25.   The terms of the Assistance Agreement largely track the terms of PSFS's March 29, 1982 proposal.   Specifically, the Agreement requires the FDIC to provide to PSFS:

(i)   a seven-year interest-bearing negotiable non-amortizing promissory note totalling $112 million;

(ii)   a seven-year interest-bearing negotiable non-amortizing promissory note totalling $108,125,000;

(iii)   an Income Maintenance Agreement for a ten-year period to compensate PSFS for the difference between the yield on a declining volume of assets and the average cost of funds for U.S. savings banks with assets in excess of $500 million.;

(iv)   an agreement to purchase from PSFS any covered loan, as defined, in default as to payment of principal and/or interest at a price equal to the lower of 80 percent of the principal book value or 95 percent of its market value;

(v)   a payment of $108,125,000.

26.   At the same time the FDIC and PSFS executed the Assistance Agreement, the parties also executed a Memorandum of Understanding regarding the computation of Income Maintenance Payments under subsection 6.2 of the Assistance Agreement, and the use by PSFS of certain accounting methods to calculate its capital for purposes of satisfying regulatory capital requirements.   (The Memorandum of Understanding is attached as Exhibit 2.)   Among other things, the parties expressly agreed in the Memorandum of Understanding that PSFS may treat "[t]he difference between the liabilities assumed and the total of the market value of the Western assets, less reserves, . . . as goodwill and amortize[]

-7-

(2) <u>Consent to Conservatorship, Etc.</u>.  If the Bank consents to the appointment of a conservator, trustee, receiver or liquidator in any insolvency, adjustment of debt, marshalling of assets and liabilities, or similar proceedings of or relating to the Bank or of or relating to all or substantially all of its property.

(3) <u>Admission of Insolvency</u>.  If the Bank admits in writing its inability to pay its debts generally as they come due, or files a petition to take advantage of any applicable bankruptcy, insolvency, or reorganization statute, or makes an assignment for the benefit of its creditors, or voluntarily suspends payments of its obligations.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their proper and duly authorized officers, upon the date first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION        THE PHILADELPHIA SAVING FUND SOCIETY

BY: _____             _____
    Robert P. Gough                          Anthony J. Nocella
    Deputy Director                          Executive Vice President - Finance
    Division of Bank Supervision

[the goodwill] on a straight-line basis up to fifteen (15) years."

27.   The Memorandum of Understanding also provided that the FDIC Promissory Note and certain PSFS Capital Notes may be treated as assets for purposes of calculating the institution's total capital.

28.   The Memorandum of Understanding was an essential component of the merger agreement.   Indeed, PSFS would not have consented to acquire the liabilities of Western if the FDIC had not agreed to the Memorandum of Understanding.

29.   The Assistance Agreement and the Memorandum of Understanding, both of which were executed together on April 3, 1982, were intended by the parties to be read and construed together.

30.   Section 4.2 of the Assistance Agreement provides that "[t]he Board of Directors of the FDIC has duly authorized the execution of this Agreement and has taken all action necessary for FDIC to enter into and perform this Agreement.   This Agreement constitutes a valid and binding obligation of FDIC, enforceable in accordance with its terms."

31.   Section 4.4 of the Assistance Agreement requires the FDIC to furnish to PSFS "prior to the execution of this Agreement, an opinion of its General Counsel that it has the legal power and authority to enter into this Agreement and to perform all acts contemplated hereunder."

32.   Consistent with section 4.4 of the Assistance Agreement, on April 3, 1982, Thomas A. Brooks, General Counsel to the FDIC, provided to PSFS a letter in which he states:

-8-

payable under this Agreement to be due and payable immediately, and upon any such declaration such principal, interest, and other amounts shall become immediately due and payable.

Section 5.2  Events of Default.  Any one of the following events shall be an event of default:

(a) Failure to Pay.  If the Bank fails to pay the principal on the Subordinated Note, when and as the same shall become due and payable, whether at maturity thereof, or by acceleration or otherwise, or if the Bank fails to pay interest on the Subordinated Note when and as the same shall become due and payable, when such default in the payment of principal or interest shall have continued for a period of fifteen (15) days after written notice thereof to the Bank.

(b) Breach of Covenants.  If the Bank fails to perform or comply with any covenant contained in Section 4.1(b) or in Section 4.3 herein.

(c) Insolvency.

(1) Court or Agency Decree.  If any court, agency, or supervisory authority having jurisdiction shall issue a decree or order for the appointment of a conservator, trustee, receiver, or liquidator in any bankruptcy, insolvency, readjustment of debt, marshalling of assets and liabilities, or similar proceeding of or relating to the Bank, or of or relating to all or substantially substantially all of its property, or for the winding-up or liquidation of its affairs, when such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days.

> Based upon my examination of the law and facts, it
> is my opinion that FDIC has the legal power and
> authority to enter into and perform the foregoing
> assistance transaction and to enter into any
> agreements and issue any notes as may be necessary
> to consummate such assistance transaction.  . . .
> The Merger Assistance Agreement and any other
> agreements and notes necessary to the consummation
> of the transaction, when duly executed by FDIC,
> will constitute the valid and binding obligations
> of the FDIC enforceable in accordance with their
> terms.

33.   At the time of execution, the terms of the Assistance Agreement and of the Memorandum of Understanding became binding upon the FDIC and PSFS as well as to any successors or assigns of the FDIC and PSFS.

34.   A news release issued by the FDIC on the day the Assistance Agreement and Memorandum of Understanding were executed and the merger was consummated acknowledged that the deal would inure to the benefit of the FDIC, the insurance fund and the public. The release stated, in part, that "a deposit payoff would have cost the FDIC approximately $696 million" if no merger partner were found for Western "compared to the merger's estimated $294 million present value cost."   Thus, according to the FDIC's own estimates, PSFS's agreement to merge with Western pursuant to the terms of the Assistance Agreement and the Memorandum of Understanding saved the government in excess of $400 million.

35.   In that same FDIC news release, FDIC Chairman William M. Isaac was quoted as saying:   "We consider [the merger] to be a solid, minimum-cost solution to the problems of one of our most seriously troubled banks.  We appreciate the work done by PSFS in helping us put the transaction together."

-9-

Section 4.3 Change of Form. If the Bank, through merger, conversion, transfer of all or substantially all of its assets and liabilities or otherwise, changes its form so that it is not insured by the FDIC or any successor of the FDIC, then, beginning on the effective date of any such change of form, the remaining portion of the principal amount of the Subordinated Note shall be repaid monthly in an amount equal to one forty-second (1/42) of the then remaining principal balance; provided, however, that all principal and interest remaining unpaid on the Maturity Date shall be paid in full.

ARTICLE V

DEFAULT

Section 5.1 Action Upon Default. If any Event of Default occurs, as defined in Section 5.2 of this Agreement, other than a Failure to Pay as defined in Section 5.2(a), and is not remedied within sixty (60) days after written notice to the Bank from the FDIC stating the specific event or events of default, or if a Failure to Pay as defined in Section 5.2(a) occurs, the following actions may be taken.

(a) Protection of Rights. The FDIC may proceed to protect and enforce its rights either by suit in equity or by action at law, or both, or by other appropriate proceedings, whether for the specific performance (to the extent permitted by law) of any covenant or agreement contained herein, or in aid of the exercise of any power granted herein.

(b) Acceleration of Maturity. The FDIC may declare, by written notice to the Bank, the principal of the Note, all interest thereon, and any other amounts

36.   Shortly after the merger was approved and the Assistance Agreement and Memorandum of Understanding were executed, the FDIC and PSFS determined that the merger generated approximately $796 million in goodwill.  Pursuant to the terms of the merger, PSFS was permitted to treat the goodwill as an intangible asset, and to amortize the asset on a fifteen year straight-line basis.

37.   On September 22, 1983, PSFS converted from a mutual to a stock savings bank.  In connection with the conversion, PSFS issued an Offering Circular advising prospective purchasers of the terms of its acquisition of Western.  In particular, the Circular stated that "[t]he acquisition of Western was treated as a purchase for financial reporting purposes.   Under the purchase method of accounting, the assets acquired (which had a book value of $2.111 billion) and the liabilities assumed (which had a book value of $2.113 billion) in the acquisition of Western have been recorded at their estimated fair values as of the merger date.  The yield on the former Western assets is being recorded on a level yield basis over the life of the assets.  The resultant difference between the fair value and the book value ($796 million at the date of acquisition), is recorded as an asset."

38.   The Circular further advised prospective purchasers that "[p]ursuant to an agreement with the FDIC made at the time of the Western acquisition, this asset is being amortized on a straight-line basis over 15 years for FDIC regulatory reporting purposes."

39.   The FDIC reviewed the Offering and authorized its dissemination to the public.

40.   In response to the Offering, PSFS sold more than 35

-10-

pending. Copies of any report required to be filed under this subsection shall be made available, by the FDIC or by the Bank, to the public upon request.

(b) Notice of Default.

(1) This Agreement. If any Event of Default under this Agreement shall occur, the Bank will promptly give written notice by registered mail to the FDIC, specifying the nature of the Event of Default and the action, if any, taken by the Bank to cure any such Event of Default.

(2) Other Indebtedness. In the event that any indebtedness of the Bank is declared due and payable before its expressed maturity, or any holder of such indebtedness shall have the right to declare such indebtedness due and payable before its expressed maturity, because of the occurrence of any default under such indebtedness, the Bank will, so long as the FDIC holds the Subordinated Note, immediately give the FDIC written notice of such declaration or right of declaration.

(c) Notice of Litigation. Promptly after the commencement thereof, but in no event more than ten (10) days after service of process upon it, the Bank will furnish the FDIC with notice of any action, suit or proceedings at law or in equity or by or before any governmental instrumentality or other agency, which, if adversely determined, would materially affect the respective business, operations, or condition (financial or otherwise) of the Bank or the ability of the Bank to perform or observe any obligation or condition on its part to be performed or observed under this Agreement.

million shares valued at the time at more than $360 million.

41.   The validity of the April 3, 1982 Memorandum of Understanding between PSFS and the FDIC was reaffirmed by the FDIC in an October 29, 1984 letter from A. David Meadows, Associate Director of the FDIC Division of Bank Supervision, to Anthony J. Nocella, Executive Vice President of PSFS.  The letter, which was in response to concerns raised by PSFS, states that "[t]he Division of Bank Supervision further confirms that the Memorandum of Understanding, dated April 3, 1982, executed in connection with PSFS's acquisition of Western Savings Fund Society remains unchanged and in place."  The letter went on to say that, "in accordance with the Memorandum, PSFS may continue to amortize the goodwill arising from the Western acquisition over the agreed-upon period."

42.   In June, 1986, PSFS changed its name to Meritor Savings Bank.

43.   On April 5, 1991, Meritor entered into a written agreement with the Pennsylvania Department of Banking and the FDIC that required Meritor to maintain the ratio of primary regulatory capital to average regulatory assets at a level not less than 8.50 percent and maintain the ratio of total risk-based capital to risk-based assets at a level not less than 10.50 percent.

44.   The April 5, 1991, agreement reaffirmed the FDIC-PSFS Assistance Agreement and Memorandum of Understanding with respect to goodwill.   The agreement also reflected the Pennsylvania Department of Banking's decision to treat the institution's goodwill as a regulatory capital asset so long as the FDIC treated

-11-

## ARTICLE IV

## COVENANTS OF THE BANK

Section 4.1 Affirmative Covenants. The Bank promises that from and after the date of this Agreement and so long as the Subordinated Note is outstanding, the Bank will comply with the following affirmative covenants.

(a) Payment of Principal and Interest. The Bank promises punctually to pay or cause to be paid the principal of, and interest on, the Subordinated Note as provided herein and therein.

(b) Preservation of Existence. The Bank promises to do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights, and franchise.

Section 4.2 Reporting Requirements. So long as the Subordinated Note remains unpaid the Bank will furnish the following reports to the FDIC at such times as specified hereunder.

(a) Annual Financial Statements. As soon as available and in any event within ninety (90) days after the end of each fiscal year of the Bank, the Bank will furnish the FDIC with a copy of the annual report of the Bank for such year, containing a balance sheet as of the end of such fiscal year and state-ments of income and retained earnings and the source and application of the Bank's funds for such fiscal year, all in reasonable detail, prepared in accor-dance with generally accepted accounting principles applied on a consistently applied basis, and certified by independent public accountants of recognized

the institution's goodwill in an identical manner. Specifically, the April 5, 1991 agreement provides that the "Bank's Primary Capital Ratio shall" include "the remaining balance of the goodwill created in conjunction with the Bank's acquisition of the Western Savings Fund Society, Philadelphia, Pennsylvania ("Western"), to the extent recognized by the FDIC . . . ."

45.   From the time of the 1982 merger until the institution was seized, PSFS/Meritor and FDIC treated the goodwill created from the Western acquisition as an asset for purposes of calculating its regulatory capital.

46.   From the time of the 1982 merger until the institution was seized, PSFS/Meritor amortized the goodwill on a 15-year straight line basis, thereby writing off more than $53 million annually.   From  1982  through  1992,  PSFS/Meritor  amortized approximately $543 million of goodwill.

47.   On September 29, 1992, the FDIC published a final rule, effective December 19, 1992, that revised the capital requirements for savings banks.   Under the newly promulgated regulations, the FDIC would be required to appoint a conservator or receiver for any institution maintaining a "ratio of tangible equity to total assets" at less than 2 percent.   The regulations did not specify whether grandfathered goodwill could be treated as an asset in calculating the ratio of tangible equity to total assets.

48.     Meritor  officials  were  concerned  about  the  new regulations' impact, if any, on the parties' Assistance Agreement and Memorandum of Understanding.   Meritor recognized that if goodwill  were  included  in  the  tangible  equity  calculations,

right of payment to its obligations to its depositors, its obligations under banker's acceptances and letters of credit, and its obligations to its other creditors (including but not limited to other banks holding liens on or rights of setoff against assets of the Bank) whether outstanding or hereafter incurred. Thus, if an Event of Subordination occurs, all such obligations shall be entitled to be paid in full before any payment shall be made on account of the principal of, or interest on, the Subordinated Note. After payment in full of all sums owing with respect to such obligations, the holder of the Subordinated Note, together with the holders of any obligations of the Bank expressly on a parity with the Subordinated Note, shall be entitled to be paid from the remaining assets of the Bank before any payment or other distribution, whether in cash, property, or otherwise, shall be made on account of any obligations of the Bank expressly subordinated to the Subordinated Note.

(b) Event of Subordination. An Event of Subordination is any receivership, conservatorship, reorganization, readjustment of debt, marshalling of assets and liabilities or similar proceedings, any liquidation, or winding-up, of or relating to, the Bank, whether voluntary or involuntary.


3.6 Use as Collateral. This Subordinated Note is ineligible as collateral for a loan by the Bank.

Meritor's ratio would exceed 4 percent.   If goodwill were not included, the ratio would approximate 1 percent and leave the institution vulnerable to an immediate government seizure.

49.   The uncertainty regarding FDIC's treatment of Meritor's goodwill under the new regulations prompted Roger S. Hillas, Chairman of Meritor, to ask FDIC, in writing, whether the new rule would permit the institution to continue to treat goodwill as an asset for purposes of calculating its tangible equity, as provided for in the parties' Assistance Agreement and Memorandum of Understanding.   This inquiry is reflected in an October 14, 1992 letter from Hillas to Paul G. Fritts, FDIC Executive Director, Division of Supervision and Resolutions.

50.   The local media widely reported that FDIC's interpretation of the term "tangible equity" could lead to the appointment of a conservator or receiver for Meritor.   For example, on October 14, 1992, the Philadelphia Inquirer reported: "At issue is whether Meritor can continue to count about $253 million in intangible 'goodwill' on its balance sheet, something the regulators have allowed it to do for decades.   The answer could determine whether the institution survives for more than a few months."

51.   The uncertainty regarding FDIC's treatment of goodwill caused many depositors to withdraw their funds from the institution.

52.   FDIC largely could have prevented the withdrawal of deposits from Meritor if it had announced that it would honor its contractual commitment and permit Meritor to include goodwill as an

-13-

(a) _Interest Rate_. The Interest Rate for payment of interest on this Note
will be determined semi-annually. With respect to each Six-Month Period, the
Interest Rate shall be the average equivalent coupon issue yield on the U.S.
Treasury's 52-week Bill auction held immediately prior to the beginning of such
Six-Month Period plus one-half of one percent (0.5%). The rate to be used for
the first interest rate payment, due July 1, 1982, shall be 14.52%.

(b) _Payment of Interest_. Interest will be calculated on a simple interest
basis using the actual number of days elapsed during each Six-Month Period and
a calendar year of 365 or 366 days, as applicable. The first interest payment
will be due on July 1, 1982 and shall include interest accrued from and includ-
ing April 3, 1982 to and including June 30, 1982. Thereafter, interest payments
of interest accrued during each Six-Month Period shall be due on the first day
of the subsequent Six-Month Period.


Section 3.4 Prepayment. The Bank may, with the permission of the FDIC, pursuant
to 12 U.S.C. § 1828(i)(1), prepay the Subordinated Note in whole or in part,
upon at least fifteen (15) Business Days' notice to FDIC, specifying the date
and the amount of prepayment, and upon the payment of accrued interest in the
amount prepaid to and including the date of prepayment; provided, however, that
partial prepayments shall be in the amount of $500,000 or any integral multiple
thereof.


Section 3.5  Subordination.

(a) _Generally_. The indebtedness of the Bank evidenced by the Subordinated
Note, including any interest due thereon, shall be subordinate and junior in

asset for purposes of calculating its regulatory capital.

53.   FDIC recognized that the decision to include or exclude goodwill in calculating Meritor's regulatory capital calculation was in the discretion of the agency.  Robert Miailovich, associate director of the FDIC's Division of Supervision was quoted by the Philadelphia Inquirer on October 24, 1992, that "[i]t's a matter of interpreting the regulations. . . . Since we wrote the regulations, I suppose there is some leeway for us to determine what we're going to do."

54.   On December 9, 1992, the FDIC issued a Notification to Primary Regulator (Pennsylvania Department of Banking) of Findings (FDIC-92-354a) in which the FDIC concluded, inter alia, that Meritor "is operating with inadequate capital."   In the same notice, the FDIC made specific findings with respect to the institution's Part 325 Tier 1 capital, adjusted Part 325 Tier 1 capital, Part 325 total assets, and adjusted 325 total assets as of July 20, 1992.

55.   FDIC's calculations of Meritor's capital in its December 9, 1992 Notification to Primary Regulator of Findings (FDIC-92-354a) excluded Meritor's $253 million in unamortized goodwill, and further excluded approximately $46 million resulting from the sale of a Florida-based savings and loan subsidiary.

56.   On December 11, 1992, the FDIC informed Meritor, by letter from Stanley J. Poling, Director of FDIC Division of Supervision, to Roger S. Hillas, Chairman of Meritor, that the FDIC determined that the regulatory definition of tangible equity excludes the $253 million of goodwill on Meritor's books.

-14-

## ARTICLE III

### TERMS OF LOAN

Section 3.1  General Provisions.  Upon the terms and conditions set forth in this Agreement, the FDIC agrees to lend to the Bank, on the Closing Date, the sum of Two Hundred Sixteen Million Two Hundred Fifty Thousand Dollars ($216,250,000) (the "principal").  On the Closing Date the Bank will deliver to the FDIC its Subordinated Note, in the form of Exhibit G hereto in the amount of the principal.  The Bank agrees to repay the principal plus interest according to the terms of this Article and the Subordinated Note, subject to the terms and conditions of this Agreement.

(a) Place and Manner of Payments.  All payments of interest and principal payable under the terms of this Agreement shall be made in immediately available funds at the office of the FDIC at the address indicated in Section 1.5 of this Agreement, or at such other address as the FDIC may specify to the Bank in writing at least five (5) Business Days before the date such payment is to be made.

(b) Payment Dates.  If a payment of interest or principal should fall due on a non-Business Day, payment made on the first Business Day following that due date will be considered timely, and no penalty will result therefrom.

Section 3.2 Principal Payments.  Principal on the Subordinated Note shall be due and payable on April 2, 1989.

Section 3.3 Interest.  Interest will accrue on the unpaid principal amount, starting on the Closing Date until all principal hereunder is paid in full.

57.   In reliance on FDIC's findings and recommendations, on December 11, 1992, Sarah W. Hargrove, the Pennsylvania Secretary of Banking, took possession of the business and property of Meritor, and appointed the FDIC as receiver.

58.   In seizing Meritor, Hargrove stated that "[t]he capital of the Bank has been significantly impaired," and that "[t]he Bank's primary and risk-based capital ratios have failed significantly below the target ratios set forth in the April 5, 1992 Written Agreement entered into by the Bank with the [Pennsylvania] Department [of Banking] and the FDIC."

59.   In so finding, Hargrove relied upon the FDIC's decision to exclude Meritor's goodwill from all capital calculations.   If goodwill had been counted as an asset, the institution's tangible equity ratio would have easily exceeded the 2 percent requirement that was to become effective eight days later pursuant to the Federal Deposit Insurance Corporation Improvement Act of 1991.

60.   If the FDIC -- when it prepared its December 9, 1992 Notification to Primary Regulator of Findings -- had included both the capital raised from the sale of the Florida-based savings and loan subsidiary as well as Meritor's $253 million in unamortized goodwill, and otherwise recognized Meritor's goodwill as a regulatory capital asset, the institution would not have been seized by either state or federal regulators.

61.   Immediately after being appointed receiver of the institution, FDIC approved the assumption of Meritor's deposits by Mellon Bank, N.A., Pittsburgh, Pennsylvania ("Mellon").   Mellon paid a premium of $181.3 million for the right to receive the

-15-

provision of Federal law as administered by the FDIC. This Agreement consti-
tutes a valid and binding obligation of FDIC and is enforceable in accordance
with its terms.

(b) FDIC Authorized to Execute Agreement. The Board of Directors of FDIC
has duly authorized the execution of this Agreement and has taken all action
necessary for the FDIC to enter into and perform this Agreement.

Section 2.3  Conditions of FDIC's Obligation. The FDIC's obligation to make
any loan under this Agreement is subject to the satisfaction of the following
conditions on or before the Closing Date.

(a) Opinion of Bank Counsel. The FDIC shall have received an opinion
from the Bank's Counsel, dated the Closing Date, and satisfactory in form and
substance to the FDIC which states that the representations and warranties
contained in paragraphs (a), (b), (c), (d), (e), and (g) of Section 2.1 of this
Agreement are accurate.

(b) Proceedings. All corporate and other proceedings to be taken in
connection with the transactions contemplated by this Agreement and all docu-
ments incidental thereto shall be satisfactory in form and substance to the
FDIC, and the FDIC shall have received all such counterpart originals or certi-
fied or other copies of such documents as FDIC may reasonably request.

(c) Legal Matters. All legal matters incident to the transactions con-
templated by this Agreement shall be satisfactory to the FDIC.

deposits and certain of Meritor's assets.

62.   The value of Meritor's stock became worthless upon the seizure of the institution, thereby causing significant injury to each shareholder.

## COUNT I.   BREACH OF CONTRACT

63.   The allegations contained in paragraphs 1 through 62 are incorporated by reference.

64.   The April 3, 1982 Assistance Agreement and Memorandum of Understanding between the FDIC and Meritor's predecessor-in-interest, PSFS, constitute a binding contract authorizing PSFS to use the purchase method of accounting in connection with the PSFS-Western merger, to treat the goodwill generated by the merger as an intangible asset for purposes of calculating its capital for all regulatory purposes, and to amortize the goodwill over 15 years using the straight-line method.

65.   In consideration for this treatment of goodwill, PSFS assumed Western's substantial liabilities and agreed to operate and manage Western.   PSFS's agreement to merge with Western saved the government, by its own estimates, in excess of $400 million.

66.   In December, 1992, in breach of the parties' contract, FDIC unilaterally determined that it would no longer include goodwill when calculating Meritor's capital.

67.   FDIC's breach of the parties' contract proximately caused the Pennsylvania Secretary of Banking to seize Meritor, and to appoint a receiver for the institution, thereby causing harm to the institution, to the plaintiff, and to every other shareholder of

-16-

(e) Third Party Consents. All governmental or other third party con-
sents, (including but not limited to approvals, licenses, registrations, or
declarations) required in connection with the Bank's execution, delivery, or
performance of this Agreement have been obtained, or will be obtained by the
Closing Date, and no other consent will be required as a precondition to the
validity or enforceability of the terms of this Agreement, or to the Bank's
borrowing hereunder.

(f) Tax Returns and Payments. The Bank has filed all tax returns which,
to the knowledge of the trustees of the Bank, are required to be filed, or the
Bank has properly been granted an extension of time for the filing thereof.  The
Bank has paid all taxes as shown on said returns and all assessments received by
them to the extent that such taxes and assessments have become due, unless the
payment of the same has been properly contested in good faith.

(g) Litigation. There is no legal action, suit, investigation, or pro-
ceeding (whether or not on behalf of the Bank) pending against or affecting the
Bank or its assets which, if adversely determined, would materially and adver-
sely affect the financial condition, business, or operations of the Bank, or the
ability of the Bank to perform or observe any obligation or condition under this
Agreement or the Subordinated Note.


Section 2.2 Representations and Warranties of FDIC. The FDIC makes the follow-
ing Representations and Warranties to the Bank.

(a) Power and Authority. The FDIC has the legal power to enter into and
perform this Agreement and the transactions contemplated hereby, and the consum-
mation of the transactions contemplated by this Agreement will not violate any

the institution.

## COUNT II: FIFTH AMENDMENT/UNCONSTITUTIONAL TAKING OF PROPERTY

68.   The allegations contained in paragraphs 1 through 67 are incorporated by reference.

69.   The April 3, 1982 Assistance Agreement and Memorandum of Understanding between the FDIC and Meritor's predecessor-in-interest, PSFS, constitute a binding contract authorizing PSFS to use the purchase method of accounting in connection with the PSFS-Western merger, to treat the goodwill generated by the merger as an intangible asset for purposes of calculating its capital for all regulatory purposes, and to amortize the goodwill over 15 years using the straight-line method.

70.   In consideration for this treatment of goodwill, PSFS assumed Western's substantial liabilities and agreed to operate and manage Western.   PSFS's agreement to merge with Western saved the government, by its own estimates, in excess of $400 million.

71.   Meritor's contractual right to treat goodwill as an intangible asset for regulatory capital purposes is a property right protected by the Fifth Amendment.

72.   FDIC's decision in December, 1992 to no longer treat Meritor's goodwill as a regulatory capital asset constituted a repudiation of the FDIC's contractual obligations, and a taking in violation of the Fifth Amendment.

73.   The FDIC's decision to no longer treat Meritor's goodwill as a regulatory capital asset proximately caused the Pennsylvania Secretary of Banking to seize Meritor, and to appoint a receiver

-17-

by the Closing Date, all necessary corporate action to authorize the
borrowings hereunder on the terms and conditions of this Agreement.

(c) Compliance with Law.

(1) The Bank is not in violation of any statute, regulation, or order
of, or any restriction imposed by, the United States of America, any state,
municipality, or other political subdivision having jurisdiction over the Bank,
or any agency thereof, in respect of the conduct of its business or the owner-
ship of its properties, which would materially and adversely affect the
business, operations, or condition (financial or otherwise) of the Bank.

(2) The execution, delivery, and performance of this Agreement and
the Subordinated Note will not violate any provision of any applicable law or
regulation, or any writ or decree of any court or governmental instrumentality.

(d) Compliance with Obligations.

(1) The Bank is not in violation or default of any obligation, agree-
ment, covenant, or condition contained in its Charter, Act of Incorporation,
or By-laws, or in any contract, lease, or other instrument to which the Bank is
a party, which default is material to the Bank or the Bank's observance or per-
formance of the terms of this Agreement, and which default has not previously
been disclosed to the FDIC.

(2) The execution, delivery, and performance of this Agreement will
not violate, conflict with, or constitute a breach of, or a default under the
Charter, or By-laws of the Bank, or any other agreement or instrument to which
the Bank is a party (or which is binding on it or its assets), and will not
result in the creation of any lien on, or security interest in, any of its
assets.

for the institution, thereby causing harm to the institution, to the plaintiff, and to every other shareholder of the institution.

COUNT III:   FIFTH AMENDMENT\UNCONSTITUTIONAL TAKING OF PROPERTY

74.   The allegations contained in paragraphs 1 through 73 are incorporated by reference.

75.   After FDIC was appointed receiver of Meritor, it sold Meritor's deposits to Mellon.   Mellon paid a premium of $181.3 million for the right to receive the deposits.

76.   The $181.3 million paid by Mellon is the property of the plaintiffs and the other shareholders of Meritor, and the FDIC was therefore obligated to pass on these funds to the plaintiffs and other shareholders.

77.   The FDIC has failed to provide to the plaintiffs and the other shareholders the funds the agency obtained through the sale of Meritor.   The FDIC has instead wrongfully retained these funds for its own use, thereby causing injury to the plaintiffs and other shareholders of $181.3 million.

COUNT IV:   FIFTH AMENDMENT/UNCONSTITUTIONAL
REGULATORY TAKING OF PROPERTY

78.   The allegations contained in paragraphs 1 through 77 are incorporated by reference.

79.   The April 3, 1982 Assistance Agreement and Memorandum of Understanding between the FDIC and Meritor's predecessor-in-interest, PSFS, constitute a binding contract authorizing PSFS to use the purchase method of accounting in connection with the PSFS-Western merger, to treat the goodwill generated by the merger as an

-18-

...reto, exist between the Parties except as expressly set forth in said docu-
...nts.

...ion 1.8  Amendments and Modifications.  Any and all amendments to or
...ifications of this Agreement shall be in writing signed by the Parties to
...is Agreement.

...ion 1.9  Headings.  The headings of the Articles, sections, and subsections
... this Agreement, except the terms identified for definition in Section 1.1,
...e inserted for convenience only and shall not be deemed to constitute a part
... this Agreement.


ARTICLE II

REPRESENTATIONS, WARRANTIES, AND CONDITIONS


...ction 2.1  Representations and Warranties of the Bank.  The Bank makes the
...llowing Representations and Warranties to the FDIC.

(a) Qualifications of the Bank.  The Bank is a mutual savings bank duly
...ganized, validly existing, and in good standing under the laws of the Common-
...ealth of Pennsylvania, and has full power and authority to own and operate its
...roperties and conduct its business as now conducted by it.

(b) Authorization of Agreement.  The Bank has full power and authority to
...xecute, deliver, and carry out this Agreement, and the Bank has taken, or will

intangible asset for purposes of calculating its capital for all regulatory purposes, and to amortize the goodwill over 15 years using the straight-line method.

80.   In consideration for this treatment of goodwill, PSFS assumed Western's substantial liabilities and agreed to operate and manage Western.   PSFS's agreement to merge with Western saved the government, by its own estimates, in excess of $400 million.

81.   On September 29, 1992, the FDIC published a final rule, effective December 19, 1992, that revised the capital requirements for savings banks.   Under the newly promulgated regulations, the FDIC would be required to appoint a conservator or receiver for any institution maintaining a "ratio of tangible equity to total assets" at less than 2 percent.   While the regulations did not specify whether goodwill could be treated as an asset in calculating the ratio of tangible equity to total assets, and Congress did not so specify, the FDIC determined to exclude goodwill from any calculation of tangible equity.

82.   Perhaps in anticipation of the effective date of the new regulations, the FDIC excluded Meritor's $253 million in unamortized goodwill in calculating the institution's capital in its December 9, 1992 Notification to Primary Regulator of Findings (FDIC-92-354a).   As a result, the FDIC concluded, inter alia, that Meritor "is operating with inadequate capital."

83.   The new treatment of goodwill negated Meritor's vested contractual right to treat the goodwill as an intangible asset to be amortized over 15 years, thereby eliminating a valuable asset on the books of Meritor.

-19-

registered mail, return receipt requested and addressed to such Party as
follows or to such other address as may be designated hereafter in writing by
each Party to the other Party hereto.

> The Philadelphia Saving Fund Society
> 1212 Market Street
> Philadelphia, Pennsylvania 19107
>
> Attention: President
>
> FDIC: Federal Deposit Insurance Corporation
>        550 17th Street, N.W.
>        Washington, D.C.  20429
>
>        Attention: Director,
>                   Division of Bank Supervision

(b) No notice or demand on the Bank shall thereby entitle the Bank to any
other or further notice or demand in the same, similar, or other circumstances.

Section 1.6  Survival of Covenants, Representations, and Warranties.  All
covenants, representations, and warranties made in this Agreement, and in any
certificates delivered pursuant hereto, shall survive the execution and delivery
of this Agreement and the making of the loan hereunder, and shall continue in
full force and effect until the Subordinated Note is paid in full.

Section 1.7  Entire Agreement.  It is expressly agreed by the Parties hereto
that this Agreement, the Subordinated Note and the Merger Assistance Agreement
embody the entire agreement of the Parties in relation to the subject matter
herein, and that no understandings or agreements, oral or written, in relation

84.   The new treatment of goodwill destroyed the economic viability of Meritor, eliminated the plaintiffs and the other shareholders' investment in the institution, and caused the Pennsylvania Department of Banking to appoint the FDIC as receiver for the institution.

85.   The new treatment of goodwill is directly contrary to plaintiffs' and the other shareholders' reasonable investment-backed expectations.

86.   FDIC's new treatment of goodwill therefore constitutes an unlawful taking of property in violation of the Fifth Amendment.

### COUNT V:  RESCISSION OF ACQUISITION OF WESTERN

87.   The allegations contained in paragraphs 1 through 86 are incorporated by reference.

88.   The agreement between Meritor's predecessor-in-interest and the FDIC concerning the treatment of goodwill in connection with Meritor's acquisition of Western was an essential term and condition of that transaction, and was essential to the parties' purpose in effecting the acquisition.

89.   PSFS would not have agreed to merge with Western if the FDIC had not agreed to count the resulting goodwill as an intangible asset to be amortized over 15 years.

90.   The parties could not have reasonably foreseen that intervening regulatory treatment of goodwill would supersede its contract, and preclude Meritor from treating goodwill as a regulatory capital asset.

91.   The new regulatory treatment of goodwill has frustrated

-20-

Section 1.2  Governing Law.  This Agreement and the rights and obligations here-under will be governed by and construed in accordance with the substantive laws of the Commonwealth of Pennsylvania to the extent that Federal law (including statutes, regulations, rulings, or interpretations of the Federal Government of the United States or any agency thereof) does not control.

Section 1.3  Waiver.  No failure or delay on the part of FDIC in exercising any right, power, or privilege hereunder or under the Subordinated Note, shall oper-ate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege, hereunder or thereunder, preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.  Any waiver by the FDIC must be expressly stated in writing, and shall be effective only in the specific instance and for the specific purpose for which it is given.

Section 1.4   Remedies.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law, particularly such rights or remedies as may be afforded FDIC by virtue of its position as the Bank's supervisor.

Section 1.5  Notices.

     (a) All notices, requests, and demands to or upon any Party to this Agreement shall be deemed to have been given or made when delivered or mailed,

the purpose of the parties' contract, deprived Meritor of the consideration for which it had bargained, and rendered Meritor undercapitalized and subject to seizure.

92.   Meritor is entitled to the return of the purchase price of Western, plus interest, to be returned to its shareholders.

### COUNT VI:   RESCISSION OF SHAREHOLDERS' INVESTMENT

93.   The allegations contained in paragraphs 1 through 92 are incorporated by reference.

94.   In reliance on the 1982 Assistance Agreement and Memorandum of Understanding, PSFS/Meritor represented to prospective purchasers that the institution and the FDIC were contractually committed to treat the acquisition of Western as a purchase for financial reporting purposes, and that Western's deficit net worth was to be treated as an intangible asset to be amortized over 15 years.   The United States knew in advance that such representations would be made.

95.   Plaintiffs and all other shareholders would not have purchased shares of stock in PSFS/Meritor but for the parties' contractual understanding regarding the treatment of goodwill because such investment would have been unsound and imprudent.

96.   The parties could not have reasonably foreseen that intervening regulatory treatment of goodwill would supersede its contract, and preclude Meritor from treating goodwill as a regulatory capital asset.

97.   FDIC's new treatment of goodwill has frustrated the purpose of the parties' contract, and rendered Meritor's stock

ARTICLE I

PROVISIONS OF GENERAL APPLICATION

1.1. Definitions.

(a) Agreement. This Subordinated Note Agreement, as the same may from time to time be amended or supplemented.

(b) Business Day. Any day which is not a Saturday, Sunday, Federal legal day, or legal holiday under the laws of the Commonwealth of Pennsylvania.

(c) Closing Date. April 3, 1982.

(d) Event of Default. This term shall have the meaning specified in Section 5.2 of this Agreement.

(e) Event of Subordination. This term shall have the meaning specified Section 3.5(b) of this Agreement.

(f) Maturity Date. The Maturity Date shall be April 2, 1989.

(g) Party. The Parties to this Agreement are the Bank and the FDIC.

(h) Person. Any natural person, association, corporation, partnership, government, or any agency, political subdivision, or instrumentality of government.

(i) Six-Month Period. The six (6) month period of each calendar year ending on June 30 and December 31.

(j) Subordinated Note. The Subordinated Note executed pursuant to this Agreement and attached hereto as Exhibit A. This term also shall include any additional notes executed pursuant to any amendments to or supplements of this Agreement, unless otherwise expressly provided in such amendment or supplement.

worthless.

98. Meritor is entitled to the return of its shareholders' investment in Meritor in an amount to be determined at trial, to be returned to the shareholders.

### COUNT VII:   INTENDED BENEFICIARIES OF CONTRACT

99. The allegations contained in paragraphs 1 through 98 are incorporated by reference.

100. Plaintiffs and all shareholders of Meritor are the intended beneficiaries of the April 3, 1982 Assistance Agreement and Memorandum of Understanding between PSFS and the FDIC. Plaintiffs and all other shareholders who purchased PSFS or Meritor stock after April 3, 1982 would not have purchased such stock if PSFS/Meritor did not have the contractual right to treat the deficit net worth inherited from Western as a regulatory capital asset because PSFS/Meritor would not have been a sound, solvent, financial institution.

101. The FDIC has breached its contract with PSFS/Meritor by refusing to allow goodwill to be treated as an intangible asset for regulatory capital purposes.

102. Plaintiffs and all shareholders are entitled to a return of their investment in Meritor.

### PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS RESPECTFULLY PRAY:

(a) That this action be certified as a class action on behalf of all shareholders of Meritor;

(b) That Meritor be awarded damages to be determined at

-22-

WHEREAS, the FDIC has examined the application of the Bank for assistance under Section 13(e) in connection with the Board's approval of the Merger, and has examined such other records and documents as deemed pertinent thereto, and based upon this review, the Board has determined that it is in the best interests of the public and the depositors and other creditors of Western to provide assistance under Section 13(e); and

WHEREAS, the Board has further determined that such assistance under Section 13(e) will reduce the risk or avert a threatened loss to FDIC; and

WHEREAS, assistance authorized under Section 13(e) will be provided by FDIC in the manner and upon such terms and conditions as are set forth in the Merger Assistance Agreement of even date herewith entered into by and between FDIC and the Bank; and

WHEREAS, said Merger Assistance Agreement provides that the FDIC will loan funds to the Bank in exchange for the Bank's subordinated note;

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, and intending to be legally bound hereby, the Bank and the FDIC hereby agree as follows:

trial;

(c)  That Meritor be awarded the return of the purchase price of Western, plus interest;

(d)  That Meritor be awarded the return of its shareholders' investment in Meritor, in an amount to be determined at trial;

(e)  That plaintiffs and the other shareholders be awarded damages to be determined at trial;

(f)  That plaintiffs and the other shareholders be awarded a return of their investment in Meritor;

(g)  That damages recovered derivatively be awarded to Meritor in trust for the shareholders;

(h)  That the Court award plaintiffs and the other shareholders their costs, attorneys' fees, and interest allowed by law;

(i)  That the Court grant such other relief as the law and evidence may justify, and that the Court may deem just and proper.

Respectfully submitted,

*Thomas M. Buchanan*

Thomas M. Buchanan
WINSTON & STRAWN
1400 L Street, N.W.
Washington, D.C.  20005
(202) 371-5700

Attorney for Plaintiff

Eric W. Bloom
WINSTON & STRAWN
1400 L Street, N.W.
Washington, D.C.  20005

Of Counsel

DATE:  April 29, 1993

-23-

## SUBORDINATED NOTE AGREEMENT

THIS AGREEMENT is made, entered into, and effective as of April 3, 1982 by between THE PHILADELPHIA SAVING FUND SOCIETY, a mutual savings bank duly organized and existing under the laws of the Commonwealth of Pennsylvania and having its principal place of business in Horsham, Pennsylvania ("Bank"), and FEDERAL DEPOSIT INSURANCE CORPORATION, a corporation duly organized and existing under the laws of the United States and having its principal place of business in Washington, District of Columbia ("FDIC").

## RECITALS

WHEREAS, the Secretary of the Department of Banking of the Commonwealth of Pennsylvania ("Secretary") has determined that THE WESTERN SAVING FUND SOCIETY OF PHILADELPHIA, an FDIC-insured mutual savings bank organized and existing under the laws of the Commonwealth of Pennsylvania and having its principal office in Haverford, Pennsylvania ("Western"), is in an unsafe or unsound condition; and

WHEREAS, application has been made by the Bank to FDIC for assistance under section 13(e) of the Federal Deposit Insurance Act (12 U.S.C. § 1823(e)) ("Section 13(e)") in order to facilitate the merger of Western into the FDIC; and

WHEREAS, the Board of Directors of FDIC ("Board") and the Secretary have approved the merger of Western into the Bank, pursuant to a Plan of Merger of even date herewith (the "Merger"); and

# EXHIBIT 1

Page

Section 5.2   Events of Default
(a) Failure to Pay . . . . . . . . . . . . . . . . . . . .   16
(b) Breach of Covenants  . . . . . . . . . . . . . . . . .   16
(c) Insolvency  . . . . . . . . . . . . . . . . . . . . .   16

## MERGER ASSISTANCE AGREEMENT

THIS AGREEMENT is made and entered into April 3, 1982, by and between the
FEDERAL DEPOSIT INSURANCE CORPORATION, a corporation organized and existing
under the laws of the United States and having its principal office in Washing-
ton, District of Columbia ("FDIC"), and THE PHILADELPHIA SAVING FUND SOCIETY,
an FDIC-insured mutual savings bank organized and existing under the laws of
the Commonwealth of Pennsylvania and having its principal office in Horsham,
Pennsylvania ("Bank").

### RECITALS

WHEREAS, the Secretary of the Department of Banking of the Commonwealth
of Pennsylvania ("Secretary") has determined that THE WESTERN SAVING FUND
SOCIETY OF PHILADELPHIA, an FDIC-insured mutual savings bank organized and
existing under the laws of the Commonwealth of Pennsylvania and having its
principal office in Haverford, Pennsylvania ("Western"), is in an unsafe or
unsound condition; and

WHEREAS, an application was made by the Bank to the FDIC for assistance
under Section 13(e) of the Federal Deposit Insurance Act (12 U.S.C. § 1823(e)),
("Section 13(e)"), in order to facilitate the merger of Western into the Bank
("Merger"); and

WHEREAS, the Merger of Western and the Bank pursuant to a Plan of Merger
dated April 2, 1982 under the charter and title of the Bank has been approved
by the Secretary of the Department of Banking of the Commonwealth of Pennsyl-
vania ("Secretary") and the FDIC; and

## ARTICLE III

### TERMS OF LOAN

Section 3.1   General Provisions
              (a) Place and Manner of Payments . . . . . . . . . . .   10
              (b) Payment Dates  . . . . . . . . . . . . . . . . .   10

Section 3.2   Principal Payments . . . . . . . . . . . . . . . . .   11

Section 3.3   Interest
              (a)  Interest Rate . . . . . . . . . . . . . . . . .   11
              (b)  Payment of Interest . . . . . . . . . . . . . .   11

Section 3.4   Prepayment . . . . . . . . . . . . . . . . . . . . .   11

Section 3.5   Subordination
              (a) Generally  . . . . . . . . . . . . . . . . . . .   11
              (b) Event of Subordination . . . . . . . . . . . . .   12

Section 3.6   Use as Collateral  . . . . . . . . . . . . . . . . .   12

## ARTICLE IV

### COVENANTS OF THE BANK

Section 4.1   Affirmative Covenants
              (a) Payment of Principal and Interest  . . . . . . .   13
              (b) Preservation of Existence  . . . . . . . . . . .   13

Section 4.2   Reporting Requirements
              (a) Annual Financial Statements  . . . . . . . . . .   13
              (b) Notice of Default  . . . . . . . . . . . . . . .   14
              (c) Notice of Litigation . . . . . . . . . . . . . .   14

Section 4.3   Change of Form . . . . . . . . . . . . . . . . . . .   15

## ARTICLE V

### DEFAULT

Section 5.1   Action Upon Default
              (a) Protection of Rights . . . . . . . . . . . . . .   15
              (b) Acceleration of Maturity . . . . . . . . . . . .   15

- 2 -

WHEREAS, Section 13(e) provides that in order to facilitate a merger of
insured banks, the FDIC may guarantee the resulting bank against loss
incurred by its assumption of the liabilities and purchase of the assets of
another bank, if such action would reduce the risk or avert a threatened loss
to the FDIC; and

WHEREAS, many of the assets acquired by the Bank from Western have a market
value of less than the carrying value on the books of Western ("book value");
and

WHEREAS, many of the assets acquired by the Bank from Western are earning a
return less than the cost of the liabilities the Bank assumed from Western; and

WHEREAS, the FDIC has examined the application of the Bank for assistance
under Section 13(e) in connection with its approval of the Merger and, based
on such review, the Board of Directors of the FDIC ("Board") has determined
that it is in the best interests of the public and the depositors and other
creditors of Western to provide assistance to facilitate the Merger; and

WHEREAS, the Board has determined that a guarantee against loss provided
under this Merger Assistance Agreement will facilitate the Merger and will
reduce the risk or avert a threatened loss to the FDIC.

NOW, THEREFORE, in consideration of the mutual covenants and promises
herein, the FDIC and the Bank hereby agree as follows:


## Section 1 - Definitions

1.1  Agreement.  This Merger Assistance Agreement, as the same may from
time to time be amended or supplemented.

1.2  Closing Date.  April 3, 1982.

SUBORDINATED NOTE AGREEMENT
BETWEEN
THE FEDERAL DEPOSIT INSURANCE CORPORATION
AND
THE PHILADELPHIA SAVING FUND SOCIETY

TABLE OF CONTENTS

Page

RECITALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

ARTICLE I

PROVISIONS OF GENERAL APPLICATION

Section 1.1   Definitions . . . . . . . . . . . . . . . . . . . . . .   3
Section 1.2   Governing Law . . . . . . . . . . . . . . . . . . . . .   4
Section 1.3   Waiver . . . . . . . . . . . . . . . . . . . . . . . .   4
Section 1.4   Remedies . . . . . . . . . . . . . . . . . . . . . . .   4
Section 1.5   Notices . . . . . . . . . . . . . . . . . . . . . . .   4
Section 1.6   Survival of Covenants, Representations, and Warranties .   5
Section 1.7   Entire Agreement . . . . . . . . . . . . . . . . . . .   5
Section 1.8   Amendments and Modifications . . . . . . . . . . . . .   6
Section 1.9   Headings . . . . . . . . . . . . . . . . . . . . . . .   6

ARTICLE II

REPRESENTATIONS, WARRANTIES, AND CONDITIONS

Section 2.1   Representations and Warranties of the Bank
              (a) Qualification of the Bank . . . . . . . . . . . . .   6
              (b) Authorization of Agreement . . . . . . . . . . . .   6
              (c) Compliance with the Law . . . . . . . . . . . . . .   7
              (d) Compliance with Obligations . . . . . . . . . . . .   7
              (e) Third Party Consents . . . . . . . . . . . . . . .   8
              (f) Tax Returns and Payments . . . . . . . . . . . . .   8
              (g) Litigation . . . . . . . . . . . . . . . . . . . .   8

Section 2.2   Representations and Warranties of FDIC
              (a) Power and Authority . . . . . . . . . . . . . . . .   8
              (b) FDIC Authorized to Execute Agreement . . . . . . .   9

Section 2.3   Conditions of FDIC's Obligation
              (a) Opinion of Bank Counsel . . . . . . . . . . . . . .   9
              (b) Proceedings . . . . . . . . . . . . . . . . . . . .   9
              (c) Legal Matters . . . . . . . . . . . . . . . . . . .   9

- 3 -

1.3 <u>Merger</u>. The Merger of Western and the Bank pursuant to the Plan of Merger of even date herewith.

1.4 <u>Person</u>. Any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

## Section 2 - <u>Conditions</u>

The obligations of the FDIC and the Bank under this Agreement are contingent upon consummation of the Merger and upon satisfaction of the following conditions:

2.1 <u>Agency Approvals</u>. All regulatory and agency actions, approvals, and consents, including any consents and approvals of the Secretary and the FDIC, shall have been obtained.

2.2 <u>Corporate Actions</u>. All corporate actions necessary to accomplish the Merger shall have been obtained or accomplished.

2.3 <u>Form and Substance</u>. All corporate and other proceedings taken in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to the Bank and its counsel and to the FDIC and its counsel.

2.4 <u>Continuance of Trustees and Officers</u>. Members of the Board of Trustees of Western shall not be trustees or officers of the Bank. The President and Chief Executive Officer of Western, William Bates, Jr., and the Executive Vice President of Western, John G. Przybylski, shall not be trustees or officers of the Bank.

EXHIBIT C (Continued)

INCOME MAINTENANCE AGREEMENT

(Dollar Amounts in Thousands)

| Calendar Quarter Ending | Defined Asset Base | Fixed Yield On The Defined Asset Base |
|---|---|---|
| March 31, 1990 | $ 1,390,000 | 8.60% |
| June 30, 1990 | 1,373,000 | 8.60% |
| September 30, 1990 | 1,357,000 | 8.60% |
| December 31, 1990 | 1,340,000 | 8.50% |
| March 31, 1991 | 1,323,000 | 8.50% |
| June 30, 1991 | 1,306,000 | 8.50% |
| September 30, 1991 | 1,288,000 | 8.50% |
| December 30, 1991 | 1,270,000 | 8.50% |
| March 30, 1992 | 1,251,000 | 8.50% |

- ii -

- 3 -

1.3 Merger. The Merger of Western and the Bank pursuant to the Plan of Merger of even date herewith.

1.4 Person. Any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

## Section 2 - Conditions

The obligations of the FDIC and the Bank under this Agreement are contingent upon consummation of the Merger and upon satisfaction of the following conditions:

2.1 Agency Approvals. All regulatory and agency actions, approvals, and consents, including any consents and approvals of the Secretary and the FDIC, shall have been obtained.

2.2 Corporate Actions. All corporate actions necessary to accomplish the Merger shall have been obtained or accomplished.

2.3 Form and Substance. All corporate and other proceedings taken in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to the Bank and its counsel and to the FDIC and its counsel.

2.4 Continuance of Trustees and Officers. Members of the Board of Trustees of Western shall not be trustees or officers of the Bank. The President and Chief Executive Officer of Western, William Bates, Jr., and the Executive Vice President of Western, John G. Przybylski, shall not be trustees or officers of the Bank.

EXHIBIT C

INCOME MAINTENANCE AGREEMENT

(Dollar Amounts in Thousands)

| Calendar Quarter Ending | Defined Asset Base | Fixed Yield On The Defined Asset Base |
|---|---|---|
| June 30, 1982 | $ 1,979,000 | 8.50% |
| September 30, 1982 | 1,956,000 | 8.50% |
| December 31, 1982 | 1,934,000 | 8.50% |
| March 31, 1983 | 1,911,000 | 8.50% |
| June 30, 1983 | 1,890,000 | 8.50% |
| September 30, 1983 | 1,869,000 | 8.50% |
| December 31, 1983 | 1,848,000 | 8.50% |
| March 31, 1984 | 1,827,000 | 8.50% |
| June 30, 1984 | 1,807,000 | 8.50% |
| September 30, 1984 | 1,790,000 | 8.50% |
| December 31, 1984 | 1,772,000 | 8.50% |
| March 31, 1985 | 1,754,000 | 8.50% |
| June 30, 1985 | 1,736,000 | 8.50% |
| September 30, 1985 | 1,716,000 | 8.50% |
| December 31, 1985 | 1,696,000 | 8.50% |
| March 31, 1986 | 1,676,000 | 8.50% |
| June 30, 1986 | 1,658,000 | 8.50% |
| September 30, 1986 | 1,640,000 | 8.50% |
| December 31, 1986 | 1,621,000 | 8.50% |
| March 31, 1987 | 1,603,000 | 8.50% |
| June 30, 1987 | 1,585,000 | 8.50% |
| September 30, 1987 | 1,567,000 | 8.50% |
| December 31, 1987 | 1,549,000 | 8.50% |
| March 31, 1988 | 1,530,000 | 8.50% |
| June 30, 1988 | 1,512,000 | 8.50% |
| September 30, 1988 | 1,494,000 | 8.50% |
| December 31, 1988 | 1,476,000 | 8.60% |
| March 31, 1989 | 1,458,000 | 8.60% |
| June 30, 1989 | 1,441,000 | 8.60% |
| September 30, 1989 | 1,424,000 | 8.60% |
| December 31, 1989 | 1,407,000 | 8.60% |

2.5 Resolutions. The obligations of the FDIC under this Agreement are also conditioned upon receipt of a certified copy of each of the resolutions of the Boards of Trustees of Western and the Bank authorizing the Merger.

Section 3 - Representations, Warranties, and Covenants of the Bank

The Bank represents, warrants, and covenants to the FDIC that:

3.1 Corporate Existence and Power. The Bank is a banking corporation duly organized, validly existing, and in good standing under the laws of the Commonwealth of Pennsylvania, and has the legal power and right to enter into and perform this Agreement.

3.2 Corporate Authority. This Agreement constitutes a valid and binding obligation of the Bank enforceable in accordance with its terms. The Bank has taken all necessary corporate action to authorize the execution and performance of this Agreement. The execution and performance of this Agreement are not in violation of any applicable law, regulation, or governmental order, or any other agreement to which the Bank is a party.

3.3 Resolution of Bank's Board of Trustees. The Bank will have furnished to the FDIC, prior to the execution of this Agreement, a certified copy of each of the resolutions of the Board of Trustees of the Bank authorizing the execution and performance of this Agreement.

3.4 Opinion of Bank Counsel. The Bank will have furnished to the FDIC, prior to the execution of this Agreement, an opinion of its counsel that it has the legal power and authority to enter into this Agreement and to perform all acts contemplated hereunder.

- 4 -

Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429

Attention:   Director, Division of Accounting and
Corporate Services

IN WITNESS WHEREOF, the FDIC has caused this Note to be duly executed and sealed
as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION

_____
Director, Division of Accounting
and Corporate Services

## Section 4 - Representations, Warranties, and Covenants of FDIC

The FDIC represents, warrants, and covenants to the Bank that:

4.1 <u>Power and Authority</u>. The FDIC has the legal power and authority to enter into this Agreement and perform the transactions contemplated hereunder. The consummation of the transactions contemplated by this Agreement will not violate any provision of Federal law administered by the FDIC.

4.2 <u>FDIC Authorized to Execute Agreement</u>. The Board of Directors of the FDIC has duly authorized the execution of this Agreement and has taken all action necessary for FDIC to enter into and perform this Agreement. This Agreement constitutes a valid and binding obligation of FDIC, enforceable in accordance with its terms.

4.3 <u>Resolution of FDIC's Board of Directors</u>. The FDIC will have furnished to the Bank, prior to the execution of this Agreement, a certified copy of a resolution duly adopted by the FDIC's Board of Directors authorizing the FDIC to enter into and perform this Agreement.

4.4 <u>Opinion of FDIC General Counsel</u>. The FDIC will have furnished to the Bank, prior to the execution of this Agreement, an opinion of its General Counsel that it has the legal power and authority to enter into this Agreement and to perform all acts contemplated hereunder.

4.5 <u>Representations with Respect to Western</u>. The FDIC represents that immediately prior to the execution of this Agreement, Western's financial state on a consolidated basis met the following criteria:

(a) Western's borrowings did not exceed $130,000,000, including debt to the Federal Reserve;

(15) days after written demand for such payment has been delivered to the FDIC by the Registered Holder, or if the FDIC shall fail to observe and perform any of the covenants or agreements of this Note and such failure shall continue for thirty (30) days after written notice thereof has been delivered to the FDIC by the Registered Holder, there shall be an Event of Default.  If an Event of Default shall occur and be continuing for five (5) days after the Registered Holder has delivered written notice thereof to the FDIC, the Registered Holder may by further written notice delivered to the FDIC declare the entire unpaid principal balance and all interest accrued to be immediately due and payable, whereupon such sums shall become due and payable without any presentment or further demand or notice of any kind, all of which are hereby expressly waived by the FDIC.  An Event of Default or Default on any Note shall not constitute the same on any other Note or Notes.

12.  Replacement of Lost, Stolen, Destroyed, or Mutilated Note.  Upon receipt of evidence reasonably satisfactory to the FDIC or its Fiscal Agent of the loss, theft, destruction, or mutilation of this Note and, in the case of any such loss, theft, or destruction, upon receipt of indemnity reasonably satisfactory to the FDIC or its Fiscal Agent, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the FDIC or its Fiscal Agent will (at the Registered Holder's expense) issue and deliver to the Registered Holder, in lieu of or in exchange for such lost, stolen, destroyed, or mutilated Note, a new note of like tenor having a principal amount equal to the unpaid principal balance of this Note and accrued interest equal to any accrued interest yet unpaid.

13.  Assignment of the Note.  The Registered Holder may assign this Note or or any Notes exchanged therefor by giving notice of assignment to the FDIC or its Fiscal Agent.  Notice shall include the names and addresses of the Registered Holder and the assignee(s), and the documents of assignment executed by the Registered Holder in a form satisfactory to the FDIC or its Fiscal Agent, or a notarized true copy of the Note showing the Registered Holder's endorsement to such assignee in a form satisfactory to the FDIC or its Fiscal Agent.  Upon finding that such notice of assignment is satisfactory to the FDIC or its Fiscal Agent, and as of the date of such receipt, the FDIC or its Fiscal Agent shall register the assignee thereunder as the registered assign and Registered Holder of the Note or Notes so assigned.  No assignment effected or attempted to be effected by any other means shall be valid or binding upon the Maker.  The FDIC will deem any Person in whose name this Note (or any replacement note or notes subsequently issued) is registered, as of the close of business on the day fifteen (15) Business Days preceding the next payment due date under Paragraph 4 or 5, to be the Registered Holder thereof for the purpose of receiving payment when due.

14.  Successors.  All covenants and conditions of this Note will be binding on the successors and assigns of the FDIC.

15.  Notices.  All notices, demands, or requests made pursuant to the terms of this Note shall be in writing and delivered in person or mailed by registered mail or certified mail, return receipt requested.  Unless otherwise provided, all notices and demands shall be deemed made upon receipt.  Any notice, request, demand or other communication to the FDIC shall be given at its principal office at the following address:

(b)  Savings deposits and savings certificates held at Western
totaled at least $1,900,000,000;

(c)  The book value of Western's liabilities did not exceed the book
value of its assets; and

(d)  There was no material change in the amount, nature, quality,
or mix of assets reflected in the consolidated financial statements of Western
as of December 31, 1981, audited by Coopers & Lybrand and supplied by the FDIC.


## Section 5 - Promissory Note

5.1  Note I.  On the Closing Date, the FDIC will issue to the Bank an
amortizing negotiable promissory note ("Note I") in the principal sum of One
Hundred Twelve Million Dollars, $112,000,000, which is payable on or before
January 1, 1989.  An unexecuted copy of Note I is attached hereto as Exhibit A
and made a part hereof.  Said Note I shall have a floating rate which shall be
calculated as set forth in paragraph number (3) of Exhibit A.  At the Bank's
option, it may exchange Note I for promissory notes, with minimum denominations
of $1,000,000, having the same maturity date and an interest rate calculated
pursuant to the same terms as Note I.  The sum of the principal amounts of all
the promissory notes thus exchanged shall equal the amount of the principal out-
standing on Note I.  This exchange shall be made within ten (10) days of the
Bank's written request to the FDIC for an exchange.

5.2  Note II.  On the Closing Date, the FDIC will issue to the Bank
a non-amortizing negotiable promissory note ("Note II") in the principal
sum of One Hundred Eight Million One Hundred Twenty-Five Thousand Dollars
($108,125,000), which is payable on or before January 1, 1989.
An unexecuted copy of Note II is attached hereto as Exhibit B

- 2 -

With respect to each Six-Month Period the Interest Rate shall be the average equivalent coupon-issue yield on the U.S. Treasury's 52-week Bill auction held immediately prior to the beginning of such Six-Month Period plus one-half of one percent (0.5%).

4. Payment of Interest. Interest will be calculated on a simple interest basis using the actual number of days elapsed during each Six-Month Period and a calendar year of 365 or 366 days as applicable. The first interest payment shall be due on _____, 19___ and shall include interest accrued from and including _____, 19___ to and including _____, 19___. Thereafter, interest payments for interest accrued during each Six-Month Period shall be due on the first day of the subsequent Six-Month Period. If any such date is not a Business Day, payment shall be due on the next Business Day.

5. Payment of Principal. The entire principal on this Note shall be due on January 1, 19___. If such date is not a Business Day, payment shall be made on the next Business Day.

6. Entire Agreement. The provisions of this Note are continued on the reverse side hereof, and such continued provisions shall for all purposes have the same effect as if set forth at this place.

7. Manner of Payment. All payments of interest and principal under the terms of this Note shall be made to the Registered Holder of this Note. All such payments shall be made at the principal office of the FDIC specified in Paragraph 15 or the office of the Fiscal Agent specified in the notice of appointment of the Fiscal Agent. At the request of the Registered Holder, payments will be forwarded to the Registered Holder at any address specified in writing to the FDIC or its Fiscal Agent at least fifteen (15) Business Days before the date such payment is to be made. The final payment of interest shall be made only upon presentation of the Note to the FDIC or its Fiscal Agent for cancellation.

8. Governing Law. This Note and the rights and obligations hereunder will be governed by the substantive laws of the State of New York to the extent that Federal law (including statutes, regulations, rulings, and interpretations of the United States or any agency thereof) does not control.

9. Headings. The headings and sub-headings of the paragraphs of this Note, except the terms identified for definition in Paragraph 1, are for convenience only and will not affect the meaning or interpretation of this Note or any provision thereof.

10. Rights and Obligations. It is expressly agreed by the FDIC that this Note embodies the entire rights and obligations of the Maker and Registered Holder in relation to the subject matter herein, and that no understandings or agreements, oral or written, in relation thereto exist except as herein expressly set forth.

11. Events of Default, Acceleration of Principal and Interest. If the FDIC fails to make any payment of principal or interest when due and payable hereunder, and such failure shall continue for fifteen



and made a part hereof. Said Note II shall have a floating rate which shall be calculated as set forth in paragraph number (3) of Exhibit B. At the Bank's action, it may exchange Note II for promissory notes, with minimum denomination $1,000,000, having the same maturity date and an interest rate calculated pursuant to the same terms as Note II. The sum of the principal amounts of all the promissory notes thus exchanged shall equal the amount of the principal outstanding on Note II. This exchange shall be made within ten (10) days of the Bank's written request to the FDIC for an exchange.

Section 6 - Income Maintenance and Purchase of Covered Loans in Default

6.1 Definitions. For the purposes of this Section 6, the following terms shall have the following meanings:

(a) Average Cost of Funds. The Average Cost of Funds shall be interest and dividends on savings deposits and time deposits, expense of Federal funds purchased and securities sold under agreements to repurchase, interest on other borrowed money, and interest on subordinated notes and debentures reduced by penalties collected from depositors due to the premature withdrawal of deposits that are not included in interest expense for Insured Mutual Savings Banks for the Calendar Quarter divided by the Calendar Quarter average balance of total deposits, Federal funds purchased and securities sold under agreements to repurchase, other liabilities for borrowed money, subordinated notes and debentures, and accrued interest payable as determined by the FDIC. The definition of the terms used in this calculation shall be as defined by the FDIC Forms 8040/18 (12-81) and 8040/51 (12-81) and the instructions thereto. The Average Cost of Funds

EXHIBIT (ii)

FEDERAL DEPOSIT INSURANCE CORPORATION
PROMISSORY NOTE

No._____
$_____
Floating Rate                                                      Date

The FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"), for value received, hereby promises to pay to the order of _____ ("Registered Holder"), an institution organized and existing under the laws of the State of _____ and having its principal office at _____ _____, or its registered assigns, in lawful money of the United States, on or before January 1, 19__, the principal sum of _____ _____ dollars ($_____) together with interest on the unpaid balance from _____, 19__ at the Interest Rate (as hereinafter set forth) until said principal sum and all accrued interest are paid.

1. Definitions. For purposes of this Note:

   (a) "Business Day" means a day other than a Saturday, Sunday, Federal legal holiday, or day on which the principal office of the FDIC or the office of the Fiscal Agent specified in the notice of appointment is closed as required or permitted under State law or the laws of the United States.

   (b) "Fiscal Agent" means any Person appointed by the FDIC as its Fiscal Agent pursuant to Paragraph 2.

   (c) "Maker" means the FDIC.

   (d) "Note" means this Promissory Note or any replacement notes.

   (e) "Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

   (f) "Registered Holder" means the above-named Registered Holder or its registered assigns.

   (g) "Six-Month Period" means the six (6) month period of each calendar year ending on June 30 and December 31.

2. Fiscal Agent. The FDIC reserves the right to appoint any person to act as its Fiscal Agent for the purposes of making payments of principal and interest under Paragraph 7, replacing Notes under Paragraph 12, and registering assignees under Paragraph 13. The FDIC shall give written notice of such appointment to each Registered Holder, at least fifteen (15) Business Days prior to the effective date of the appointment. The FDIC may change Fiscal Agents at any time by following the same procedure. Once a Fiscal Agent is appointed all notices, demands, and communications regarding those matters specified in Paragraphs 7, 12, and 13, other than notices and/or demands made pursuant to Paragraph 11, shall be delivered to the Fiscal Agent and not the FDIC.

3. Determination of Interest Rate. The Interest Rate for payment of interest on this Note shall be determined semi-annually.

- 8 -

computation will not be affected by any FDIC subsidy programs that would unfairly penalize the Bank.

(b) <u>Calendar Quarter</u>. The three (3) month period of each calendar year ending on March 31, June 30, September 30, or December 31; provided however, that the second Calendar Quarter of 1982 shall include the peri of April 3, 1982 through June 30, 1982 (89 days).

(c) <u>Covered Loans</u>. Covered Loans shall include the private placen securities and commercial mortgage loan portfolios on the books of West as of the Closing Date.

(d) <u>Defined Asset Base</u>. The Defined Asset Base specified by the fixed dollar value for the Calendar Quarter set forth in the schedul attached hereto as Exhibit C and made a part hereof as adjusted for the purchase of Covered Loans by the FDIC pursuant to Subsection 6.3 of thi Agreement.

(e) <u>Fixed Yield on the Defined Asset Base</u>. The Fixed Yield on th Defined Asset Base for each Calendar Quarter as set forth in the schedu attached hereto as Exhibit C and made a part hereof.

(f) <u>Insured Mutual Savings Banks</u>. All FDIC-insured mutual savings banks having assets in excess of $500,000,000 at the end of the calendar year, as determined by the FDIC. All such determi-nations shall be final.

(g) <u>Market Value on Covered Loans</u>. The Market Value of the Cover Loan shall be the present value of principal and interest payments fixe the contractual terms of the Covered Loan on the Closing Date discounte the following rates as of the purchase date:

- 4 -

15. Notices. All notices, demands, or requests made pursuant to the terms of this Note shall be in writing and delivered in person or mailed by registered mail or certified mail, return receipt requested. Unless otherwise provided, all notices and demands shall be deemed made upon receipt. Any notice, request, demand, or other communication to the FDIC shall be given at its principal office at the following address:

Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429

Attention: Director, Division of Accounting and
            Corporate Services

IN WITNESS WHEREOF, the FDIC has caused this Note to be duly executed and sealed as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION

_____
Deputy Director, Division of Bank
Supervision (Operations Branch)

1. Amortizing Covered Loans – the yield on Government National Mortgage Corporation passthrough certificates with stated pool coupon rates as published in the Wall Street Journal closest to the contractual interest rate on Covered Loans plus 50 basis points;

2. Nonamortizing Covered Loans – the yield published by Salomon Brothers, Inc. (1 New York Plaza, New York, New York) for comparable term AA rated new issue industrial bonds or by a mutually agreeable nationally recognized index.

6.2 Computation of Income Maintenance Payment.

(a) The FDIC shall compute and pay to the Bank an Income Maintenance Payment for each Calendar Quarter beginning with the second Calendar Quarter of 1982 and ending with the first Calendar Quarter of 1992, determined by (i) subtracting the Fixed Yield on the Defined Asset Base from the Average Cost of Funds, (ii) multiplying the difference by a fraction the numerator of which shall be the number of days in the Calendar Quarter and the denominator of which shall be the number of days in the calendar year and (iii) multiplying the product by the fixed dollar value of the Defined Asset Base for the Calendar Quarter. For each Calendar Quarter during the term of this Agreement, the Average Cost of Funds for the prior Calendar Quarter shall be used to compute each Income Maintenance Payment due.



- 3 -

tered Holder has delivered written notice thereof to the FDIC, the Registered Holder may by further written notice delivered to the FDIC declare the entire unpaid principal balance and all interest accrued to be immediately due and payable, whereupon such sums shall become due and payable without any presentment or further demand or notice of any kind, all of which are hereby expressly waived by the FDIC. An Event of Default or Default on any Note shall not constitute the same on any other Note or Notes.

11. **Replacement of Lost, Stolen, Destroyed, or Mutilated Note.** Upon receipt of evidence reasonably satisfactory to the FDIC or its Fiscal Agent of the loss, theft, destruction, or mutilation of this Note and, in the case of any such loss, theft, or destruction, upon receipt of indemnity reasonably satisfactory to the FDIC or its Fiscal Agent, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the FDIC or its Fiscal Agent will (at the Registered Holder's expense) issue and deliver to the Registered Holder, in lieu of or in exchange for such lost, stolen, destroyed, or mutilated Note, a new note of like tenor having a principal amount equal to the unpaid principal balance of this Note and accrued interest equal to any accrued interest yet unpaid.

12. **Exchange of Note.** This Note may be exchanged for a new note or new notes having the same maturity date and an interest rate calculated pursuant to the same terms as this Note. The principal amount of the new note, or if the Note is exchanged for more than one (1) new note, the sum of the principal amounts of all the new notes exchanged, shall equal the amount of the principal outstanding on the note at the time of the exchange. This Note may only be exchanged for a new note or new notes with minimum denominations of One Million Dollars ($1,000,000). Exchanges shall be made within ten (10) days of the Registered Holder's written request for an exchange to the FDIC or its Fiscal Agent. The new note or new notes, received in exchange for this Note, shall be in the form attached hereto as Exhibit (ii).

13. **Assignment of the Note.** This Note may not be assigned; however, the Registered Holder may assign any new note or new notes exchanged for this Note by giving notice of assignment to the FDIC or its Fiscal Agent. Notice shall include the names and addresses of the Registered Holder and the assignee(s), and the documents of assignment executed by the Registered Holder in a form satisfactory to the FDIC or its Fiscal Agent, or a notarized true copy of the note showing the Registered Holder's endorsement to such assignee in a form satisfactory to the FDIC or its Fiscal Agent. Upon finding that such notice of assignment is satisfactory to the FDIC or its Fiscal Agent, and as of the date of such receipt, the FDIC or its Fiscal Agent shall register the assignee thereunder as the registered assign and Registered Holder of the note or notes so assigned. No assignment effected or attempted to be effected by any other means shall be valid or binding upon the Maker. The FDIC will deem any Person in whose name this Note (or any replacement or exchanged note or notes subsequently issued) is registered, as of the close of business on the day fifteen (15) Business Days preceding the next payment due date under Paragraph 4 or 5, to be the Registered Holder thereof for the purpose of receiving payment when due.

14. **Successors.** All covenants and conditions of this Note will be binding on the successors and assigns of the FDIC.

- 10 -

(b)  If for any Calendar Quarter the Fixed Yield on the Defined Asset Base exceeds the Average Cost of Funds for the prior Calendar Quarter, the Bank will pay to the FDIC a Margin Payment determined by the FDIC by (i) subtracting the Average Cost of Funds for the prior Calendar Quarter from the Fixed Yield on the Defined Asset Base for the Calendar Quarter, (ii) multiplying the difference by a fraction the numerator of which is the number of days in the Calendar Quarter and the denominator of which is the number of days in the calendar year, (iii) multiplying the product by the fixed dollar value of the Defined Asset Base for the Calendar Quarter, and (iv) multiplying the result by one-third (1/3).

(c)  The parties have agreed upon an illustration of the calculation of the Income Maintenance payments and such illustration shall be used to clarify the definitions or Computations of Income Maintenance Payments as expressed in Subsections 6.1 and 6.2.

6.3  Manner of Payment.  Promptly after the end of each Calendar Quarter, the FDIC or the Bank, as the case may be, shall pay to the other any amount due under this Agreement.  All income maintenance payments will be made in lawful money of the United States in immediately available funds to the appropriate party hereto at the address set forth in Section 11.6 or at the principal office of its successor.

6.4  FDIC Purchase of Covered Loans in Default.

(a)  The FDIC agrees to purchase within thirty (30) days of written notification by the Bank, Covered Loans in default (i.e., past due) as



- 2 -

With respect to each Six-Month Period the Interest Rate shall
be the average equivalent coupon-issue yield on the U.S. Trea-
sury's 52-week Bill auction held immediately prior to the
beginning of such Six-Month Period plus one-half of one per-
cent (0.5%).

4. Payment of Interest. Interest will be calculated on a simple
interest basis using the actual number of days elapsed during
each Six-Month Period and a calendar year of 365 or 366 days
as applicable. The first interest payment shall be due on
July 1, 1982 and shall include interest accrued from and
including April 3, 1982 to and including June 30, 1982.
Thereafter, interest payments for interest accrued during
each Six-Month Period shall be due on the first day of the
subsequent Six-Month Period. If any such date is not a Busi-
ness Day, payment shall be due on the next Business Day.

5. Payment of Principal. The entire principal on this Note
shall be due on January 1, 1989. If such date is not a
Business Day, payment shall be made on the next Business
Day.

6. Manner of Payment. All payments of interest and principal under
the terms of this Note shall be made to the Registered Holder of
this Note. All such payments shall be made at the principal
office of the FDIC specified in Paragraph 15 or the office of the
Fiscal Agent specified in the notice of appointment of the Fiscal
Agent. At the request of the Registered Holder, payments will be
forwarded to the Registered Holder at any address specified in
writing to the FDIC or its Fiscal Agent at least fifteen (15)
Business Days before the date such payment is to be made. The
final payment of interest shall be made only upon presentation
of the Note to the FDIC or its Fiscal Agent for cancellation.

7. Governing Law. This Note and the rights and obligations hereunder
will be governed by the substantive laws of the Commonwealth of
Pennsylvania to the extent that Federal law (including statutes,
regulations, rulings, and interpretations of the United States or
any agency thereof) does not control.

8. Headings. The headings and sub-headings of the paragraphs of this
Note, except the terms identified for definition in Paragraph 1,
are for convenience only and will not affect the meaning or inter-
pretation of this Note or any provision thereof.

9. Rights and Obligations. It is expressly agreed by the FDIC that
this Note embodies the entire rights and obligations of the Maker
and Registered Holder in relation to the subject matter herein,
and that no understandings or agreements, oral or written, in
relation thereto exist except as herein expressly set forth.

10. Events of Default; Acceleration of Principal and Interest. If the
FDIC fails to make any payment of principal or interest when due
and payable hereunder, and such failure shall continue for fifteen
(15) days after written demand for such payment has been delivered
to the FDIC by the Registered Holder, or if the FDIC shall fail to
observe and perform any of the covenants or agreements of this Note
and such failure shall continue for thirty (30) days after written
notice thereof has been delivered to the FDIC by the Registered
Holder, there shall be an Event of Default. If an Event of Default
shall occur and be continuing for five (5) days after the Regis-

to payment of principal and/or interest for one hundred twenty (120) days or more at a price equal to the lower of eighty percent (80%) of principal book value or ninety-five percent (95%) of the Market Value of the Covered Loan computed on the date of purchase by the FDIC based upon the contract terms of the Covered Loan (excluding any rights of acceleration).

(b)  Any Covered Loan purchased under this provision will reduce the Defined Asset Base for the Calendar Quarter during which the purchase was made by the principal book balance of the Covered Loan purchased, less (i) five percent (5%) of the Market Value of the Covered Loan if the price paid by the FDIC was based on the Market Value of the Covered Loan, or (ii) twenty percent (20%) of the principal book balance if the price paid by the FDIC was based on the principal book value of the Covered Loans.  In subsequent Calendar Quarters, the Defined Asset Base will be reduced by the percentage that the Defined Asset Base in each subsequent Calendar Quarter bears to the Defined Asset Base for the Calendar Quarter of the Covered Loan purchase times the amount of reduction in the Defined Asset Base at the time of purchase of the Covered Loan.  This subsection will apply only to Covered Loans of over One Million Dollars ($1,000,000) outstanding principal balance on the Bank's books (less participations sold) as of the date of default.  With respect to the private placement portfolio, all Covered Loans to a single credit may be considered a single Covered Loan, for purposes of determining the One Million

EXHIBIT B

### FEDERAL DEPOSIT INSURANCE CORPORATION
### PROMISSORY NOTE

No. D-101
$108,125,000
Floating Rate

April 3, 1982

The FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"), for value received, hereby promises to pay to the order of THE PHILADELPHIA SAVING FUND SOCIETY ("Registered Holder"), an institution organized and existing under the laws of the Commonwealth of Pennsylvania and having its principal office at 1212 Market Street, Philadelphia, Pennsylvania 19107, or its registered assigns, in lawful money of the United States, on or before January 1, 1989, the principal sum of One Hundred Eight Million One Hundred Twenty-Five Thousand Dollars ($108,125,000) together with interest on the unpaid balance from April 3, 1982 at the Interest Rate (as hereinafter set forth) until said principal sum and all accrued interest are paid.

1. Definitions. For purposes of this Note:

   (a) "Business Day" means a day other than a Saturday, Sunday, Federal legal holiday, or day on which the principal office of the FDIC or the office of the Fiscal Agent specified in the notice of appointment is closed as required or permitted under State law or the laws of the United States.

   (b) "Fiscal Agent" means any Person appointed by the FDIC as its Fiscal Agent pursuant to Paragraph 2.

   (c) "Maker" means the FDIC.

   (d) "Note" means this Promissory Note or any replacement notes.

   (e) "Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

   (f) "Registered Holder" means the above-named Registered Holder or its registered assigns.

   (g) "Six-Month Period" means the six (6) month period of each calendar year ending on June 30 and December 31.

2. Fiscal Agent. The FDIC reserves the right to appoint any person to act as its Fiscal Agent for the purposes of making payments of principal and interest under Paragraph 6, replacing Notes under Paragraph 11, and registering assignees under Paragraph 13. The FDIC shall give written notice of such appointment to each Registered Holder, at least five (5) Business Days prior to the effective date of the appointment. The FDIC may change Fiscal Agents at any time by following the same procedure. Once a Fiscal Agent is appointed all notices, demands, and communications regarding those matters specified in Paragraphs 6, 11, and 13, other than notices and/or demands made pursuant to Paragraph 10, shall be delivered to the Fiscal Agent and not the FDIC.

3. Determination of Interest Rate. The Interest Rate for payment of interest on this Note shall be determined semi-annually.

Dollars ($1,000,000) limitation but only the portion of the line in default as to payment of principal and/or interest will be purchased.

(c)  To exercise its rights under this provision, the Bank must notify the FDIC within one hundred eighty (180) days of the original default (or within ninety (90) days of the date of this Agreement, whichever is later) and the original default must occur on or before five (5) years from the date of this Agreement for commercial mort-gages and ten (10) years from the date of this Agreement for private placement securities.  The FDIC will not purchase any Covered Loan under this provision which has been modified, extended, refinanced, or compromised by the Bank.  Under no circumstances will the FDIC include in the purchase price more than six (6) months accrued interest on the loan purchased.

6.5  Termination of Income Maintenance Payments.  The provisions of Sub-sections 6.1 and 6.2 shall terminate and the obligation of the FDIC or the Bank to make any payments hereunder shall cease upon March 31, 1992, provided, how-ever, that the Bank may voluntarily terminate the provisions of Subsections 6.1 and 6.2 upon written notice to the FDIC at any time prior to March 31, 1992, and the obligation of the FDIC or the Bank to make any payments under those Subsec-tions shall cease.  Termination shall be effective upon the giving of a notice as provided in Subsection 11.6 or such later date as set forth in the notice of termination.

6.6  Termination Upon Receivership.  Any and all obligations of the FDIC under this Section 6 shall terminate effective upon the appointment of a re-ceiver or other official for the purpose of liquidating the Bank.



7. Manner of Payment. All payments of interest and principal payable under the terms of this Note shall be made to the Registered Holder of this Note. All such payments shall be made at the principal office of the FDIC specified in Paragraph 15 or in the office of the Fiscal Agent specified in the notice of appointment of the Fiscal Agent. At the request of the Registered Holder, payments will be forwarded to the Registered Holder at any address specified in writing to the FDIC or its Fiscal Agent at least fifteen (15) Business Days before the date such payment is to be made. The final payment of interest shall be made only upon presentation of the Note to the FDIC or its Fiscal Agent for cancellation.

8. Governing Law. This Note and the rights and obligations hereunder will be governed by the substantive laws of the State of New York to the extent that Federal law (including statutes, regulations, rulings, and interpretations of the United States or any agency thereof) does not control.

9. Headings. The headings and sub-headings of the paragraphs of this Note, except the terms identified for definition in Paragraph 1, are for convenience only and will not affect the meaning or interpretation of this Note or any provision thereof.

10. Rights and Obligations. It is expressly agreed by the FDIC that this Note embodies the entire rights and obligations of the Maker and Registered Holder in relation to the subject matter herein, and that no understandings or agreements, oral or written, in relation thereto exist except as herein expressly set forth.

11. Events of Default; Acceleration of Principal and Interest. If the FDIC fails to make any payment of principal or interest when due and payable hereunder, and such failure shall continue for fifteen (15) days after written demand for such payment has been delivered to the FDIC by the Registered Holder, or if the FDIC shall fail to observe and perform any of the covenants or agreements of this Note and such failure shall continue for thirty (30) days after written notice thereof has been delivered to the FDIC by the Registered Holder, there shall be an Event of Default. If an Event of Default shall occur and be continuing for five (5) days after the Registered Holder has delivered written notice thereof to the FDIC, the Registered Holder may by further written notice delivered to the FDIC declare the entire unpaid principal balance and all interest accrued to be immediately due and payable, whereupon such sums shall become due and payable without any presentment or further demand or notice of any kind, all of which are hereby expressly waived by the FDIC. An Event of Default or Default on any Note shall not constitute the same on any other Note or Notes.

12. Replacement of Lost, Stolen, Destroyed, or Mutilated Note. Upon receipt of evidence reasonably satisfactory to the FDIC or its Fiscal Agent of the loss, theft, destruction, or mutilation of this Note and, in the case of any such loss, theft, or destruction, upon receipt of indemnity reasonably satisfactory to the FDIC or its Fiscal Agent, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the FDIC or its Fiscal Agent will (at the Registered Holder's expense) issue and deliver to the Registered Holder, in lieu of or in exchange for such lost, stolen, destroyed, or mutilated Note, a new note of like tenor having a principal amount equal to the unpaid principal balance of this Note and accrued interest equal to any accrued interest yet unpaid.

13. Assignment of the Note. The Registered Holder may assign this Note or any Notes exchanged therefor by giving notice of assignment to the FDIC or its Fiscal Agent. Notice shall include the names and addresses of the Registered Holder and the assignee(s), and the documents of assignment executed by the Registered Holder in a form satisfactory to the FDIC or its Fiscal Agent, or a notarized true copy of the Note showing the Registered Holder's endorsement to such assignee in a form satisfactory to the FDIC or its Fiscal Agent. Upon finding that such notice of assignment is satisfactory to the FDIC or its Fiscal Agent, and as of the date of such receipt, the FDIC or its Fiscal Agent shall register the assignee thereunder as the registered assign and Registered Holder of the Note or Notes so assigned. No assignment effected or attempted to be effected by any other means shall be valid or binding upon the Maker. The FDIC will deem any Person in whose name this Note (or any replacement note or notes subsequently issued) is registered, as of the close of business on the day fifteen (15) Business Days preceding the next payment due date under Paragraph 4 or 5, to be the Registered Holder thereof for the purpose of receiving payment when due.

14. Successors. All covenants and conditions of this Note will be binding on the successors and assigns of the FDIC.

15. Notices. All notices, demands, or requests made pursuant to the terms of this Note shall be in writing and delivered in person or mailed by registered mail or certified mail, return receipt requested. Unless otherwise provided all notices and demands shall be deemed made upon receipt. Any notice, request, demand, or other communication to the FDIC shall be given at its principal office at the following address:

Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429
Attention: Director, Division of Accounting and Corporate Services

- 13 -

## Section 7 - Subordinated Notes

the Closing Date, the Bank will issue to the FDIC its subordinated note
principal sum of Two Hundred Sixteen Million Two Hundred Fifty Thousand
lars ($216,250,000), pursuant to the Subordinated Note Agreement between
ank and the FDIC of even date herewith.  In partial consideration for the
ank's subordinated note, the FDIC will pay to the Bank on the Closing Date
such day is not a business day, on the next business day the sum of One F
red Eight Million One Hundred Twenty-Five Thousand Dollars ($108,125,000)
wful money of the United States in immediately available funds at its accc
th First Pennsylvania Bank, Philadelphia, Pennsylvania.  The Bank will use
these funds to settle the outstanding debt of Western to the Federal Reserve
ank of Philadelphia on the books of Western on the Closing Date.  Unexecute
pies of this Subordinated Note Agreement and Subordinated Note are attache
ereto as Exhibits D and E respectively.

## Section 8 - Modified Office Lease Payments

The FDIC agrees to reimburse the Bank for two-thirds of (a) all dollar amoun
aid by the Bank in excess of the fair market rent payable under any of
estern's leases due to modifications of such leases as a result of the Merg
nd (b) litigation expenses paid by the Bank relating to the Bank's right to
ccupy any premises occupied by Western prior to the Merger.  The FDIC's tot
ability under this section is limited to total payments of Two Million Dol
$2,000,000) and shall terminate ten (10) years after this Agreement.  Any
mounts paid by the Bank during any Calendar Quarter as defined in paragraph



EXHIBIT (1)

# Federal Deposit Insurance Corporation
## Promissory Note

No. _____

_____, 19 ____

Floating Rate

The FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"), for value received, hereby promises to pay to the order of _____

("Registered Holder"), an institution organized and existing under the laws of the State of _____ and having its principal office at _____

or its registered assigns, in lawful money of the United States, on or before January 1, 19 ____, the principal sum of _____ dollars ($ _____ )

together with interest on the unpaid principal balance from _____, 19 ____ at the Interest Rate (as hereinafter set forth) until said principal sum and all accrued interest are paid.

1. Definitions. For purposes of this Note:
   (a) "Business Day" means a day other than a Saturday, Sunday, Federal legal holiday, or day on which the principal office of the FDIC or the office of the Fiscal Agent specified in the notice of appointment is closed as required or permitted under State law or the laws of the United States.
   (b) "Calendar Quarter" means the three (3) month period of each calendar year ending on March 31, June 30, September 30, and December 31.
   (c) "Fiscal Agent" means any Person appointed by the FDIC as its Fiscal Agent pursuant to Paragraph 2.
   (d) "Maker" means the FDIC.
   (e) "Note" means this Promissory Note or any replacement notes.
   (f) "Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.
   (g) "Registered Holder" means the above-named Registered Holder or its registered assigns.

2. Fiscal Agent. The FDIC reserves the right to appoint any person to act as its Fiscal Agent for the purposes of making payments of principal and interest under Paragraph 7, replacing Notes under Paragraph 12, and registering assignees under Paragraph 13. The FDIC shall give written notice of such appointment to each Registered Holder, at least fifteen (15) Business Days prior to the effective date of the appointment. The FDIC may change Fiscal Agents at any time by following the same procedure. Once a Fiscal Agent is appointed all notices, demands, and communications regarding those matters specified in Paragraphs 7, 12, and 13, other than notices and/or demands made pursuant to Paragraph 11, shall be delivered to the Fiscal Agent and not the FDIC.

3. Determination of Interest Rate. The interest Rate for payment of interest on this Note shall be determined quarterly. With respect to each Calendar Quarter, the Interest Rate shall be the average equivalent coupon-issue yield on the U.S. Treasury's 91-week Bill auction held immediately prior to the beginning of such Calendar Quarter plus one-half of one percent (0.5%).

4. Payment of Interest. Interest will be calculated on a simple interest basis using the actual number of days elapsed during each Calendar Quarter and a calendar year of 365 or 366 days as applicable. The first interest payment shall be due on _____, 19 ____ and shall include interest accrued from and including _____ 19 ____ to and including _____, 19 ____. Thereafter, interest payments for interest accrued during each Calendar Quarter shall be due on the first day of the subsequent Calendar Quarter. If any such date is not a Business Day, payment shall be due on the next Business Day.

5. Payment of Principal. Principal on this Note shall be paid in equal annual installments, due on each January 1, beginning in 19 ____. If such date is not a Business Day, payment shall be made on the next Business Day.

6. Entire Agreement. The provisions of this Note are continued on the reverse side hereof, and such continued provisions shall be all purposes be a part and the rules out of set forth at this place.

IN WITNESS WHEREOF, the FDIC has caused this Note to be duly executed and sealed as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION

By _____

(SEAL)

subsection 6.1, which would qualify for reimbursement under (a) and (b)
...e, shall be paid promptly by the FDIC at the end of such Calendar Quarter,
...ded that written notification by the Bank of the FDIC's payments required
...this Section has been given to the FDIC at least thirty (30) days prior to
.. last day of the Calendar Quarter.  If written notification is given to the
... less than thirty (30) days prior to the last day of the Calendar Quarter,
.. FDIC shall make such payment to the Bank at the end of the subsequent Calen-
.. Quarter.  The written notification shall include a reasonable basis for the
...est for FDIC payment under this section.  The Bank agrees to promptly pro-
.. the FDIC with further clarification and documentation of the basis for the
...k's request as shall be reasonably required by the FDIC.


## Section 9 - Trustees and Officers

.. former President and Chief Executive Officer of Western, William Bates,
.., and the former Executive Vice President of Western, John G. Przybylski,
.. any former member of the Board of Trustees of  Western may not be appointed,
...cted, or employed by the Bank as a member of its Board of Trustees or as an
...icer or employee of the Bank, unless thirty (30) days prior written notice
.. been given to the FDIC, and the FDIC has interposed no written objection to
...n appointment, election, or employment within that period.


## Section 10 - Indemnity

10.1  Definitions.  For the purposes of this Section 10 and Section 11.4 the
...lowing terms shall have the following meanings:

- 4 -

15. Notices. All notices, demands, or requests made pursuant to the terms of this Note shall be in writing and delivered in person or mailed by registered mail or certified mail, return receipt requested. Unless otherwise provided, all notices and demands shall be deemed made upon receipt. Any notice, request, demand, or other communication to the FDIC shall be given at its principal office at the following address:

> Federal Deposit Insurance Corporation
> 550 17th Street, N.W.
> Washington, D.C. 20429
>
> Attention:  Director, Division of Accounting and
>               Corporate Services

IN WITNESS WHEREOF, the FDIC has caused this Note to be duly executed and sealed as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION

Deputy Director, Division of Bank
  Supervision (Operations Branch)

(a) Indemnitees. The term "Indemnitees" includes the Bank, its trustees, officers, employees, and agents. However, that term does not include anyone who was a trustee, officer, employee, or agent of Western, or any of its subsidiaries or affiliates if the claim for indemnity relates to acts or omissions of such Person in any such capacity.

(b) Book Liabilities. Obligations of or claims against Western which are shown or indicated on its balance sheet as of the date of the Merger or otherwise disclosed in writing to the Bank prior to the date of the Merger including subordinated debt.

(c) Loss. Any amount which any Indemnitee is required to pay as a result of a successful claim finally adjudicated on the merits in a court of competent jurisdiction or which is paid with the written consent of the FDIC including any costs, counsel fees, and expenses; except no consent is required as to claims under subparagraph (b) of Subsection 10.3.

10.2 Disclaimer. Except as otherwise provided herein, the acquisition by the Bank of the assets and liabilities of Western pursuant to the Merger is intended to be without recourse or liability on the part of the FDIC. The FDIC makes no warranties or indemnitees whatsoever with regard to any asset or liability of Western or any other loss or liability in any way arising out of the Merger or this Agreement, contingent or otherwise, except as provided in this Section and Section 4.

10.3 Indemnity. Notwithstanding the foregoing, the FDIC will indemnify and hold the indemnitees harmless against any loss sustained by reason of:



- 3 -

Registered Holder may by further written notice delivered to the
FDIC declare the entire unpaid principal balance and all interest
accrued to be immediately due and payable, whereupon such sums
shall become due and payable without any presentment or further
demand or notice of any kind, all of which are hereby expressly
waived by the FDIC. An Event of Default or Default on any Note
shall not constitute the same on any other Note or Notes.

11. Replacement of Lost, Stolen, Destroyed, or Mutilated Note. Upon
receipt of evidence reasonably satisfactory to the FDIC or its
Fiscal Agent of the loss, theft, destruction, or mutilation of
this Note and, in the case of any such loss, theft, or destruc-
tion, upon receipt of indemnity reasonably satisfactory to the
FDIC or its Fiscal Agent, or, in the case of any such muti-
lation, upon surrender and cancellation of this Note, the FDIC
or its Fiscal Agent will (at the Registered Holder's expense)
issue and deliver to the Registered Holder, in lieu of or in
exchange for such lost, stolen, destroyed, or mutilated Note,
a new note of like tenor having a principal amount equal to
the unpaid principal balance of this Note and accrued interest
equal to any accrued interest yet unpaid.

12. Exchange of Note. This Note may be exchanged for a new note or
new notes having the same maturity date and an interest rate
calculated pursuant to the same terms as this Note. The prin-
cipal amount of the new note, or if the Note is exchanged for
more than one (1) new note, the sum of the principal amounts
of all the new notes exchanged, shall equal the amount of the
principal outstanding on the note at the time of the exchange.
This Note may only be exchanged for a new note or new notes
with minimum denominations of One Million Dollars
($1,000,000). Exchanges shall be made within ten (10) days of
the Registered Holder's written request for an exchange to the
FDIC or its Fiscal Agent. The new note or new notes, received
in exchange for this Note, shall be in the form attached
hereto as Exhibit (i).

13. Assignment of the Note. This Note may not be assigned; however,
the Registered Holder may assign any new note or new notes ex-
changed for this Note by giving notice of assignment to the FDIC
or its Fiscal Agent. Notice shall include the names and
addresses of the Registered Holder and the assignee(s), and the
documents of assignment executed by the Registered Holder in a
form satisfactory to the FDIC or its Fiscal Agent, or a notarized
true copy of the note showing the Registered Holder's endorsement
to such assignee in a form satisfactory to the FDIC or its Fiscal
Agent. Upon finding that such notice of assignment is satis-
factory to the FDIC or its Fiscal Agent, and as of the date of
such receipt, the FDIC or its Fiscal Agent shall register the
assignee thereunder as the registered assign and Registered
Holder of the note or notes so assigned. No assignment effected
or attempted to be effected by any other means shall be valid or
binding upon the Maker. The FDIC will deem any Person in whose
name this Note (or any replacement or exchanged note or notes
subsequently issued) is registered, as of the close of business
on the day fifteen (15) Business Days preceding the next payment
due date under Paragraph 4 or 5, to be the Registered Holder
thereof for the purpose of receiving payment when due.

14. Successors. All covenants and conditions of this Note will be
binding on the successors and assigns of the FDIC.

(1) Any obligation which would have been an obligation of
Western had this Merger not taken place and which is
not a Book Liability;

(2) any action taken by Indemnitees subsequent to the
Merger at the written direction of FDIC;

provided, however, that such indemnity is limited as to amount as follows:

(a) Loss arising from a single transaction or occurrence and
otherwise indemnifiable hereunder which exceeds $100,000:

The FDIC shall have no liability whatsoever to
indemnify hereunder for any such loss unless and
until the Bank has sustained such losses in the
amount of One Million Dollars ($1,000,000) it
being intended that the Bank bear such losses up
to $1,000,000.

(b) Loss arising from a single transaction or occurrence and
otherwise indemnifiable hereunder which is less than or equal to
$100,000:

The FDIC shall have no liability whatsoever to
indemnify the Bank against any such loss unless
and until the Bank has sustained such losses in
the total amount of Five Million Dollars
($5,000,000).  Then, and in such event, the FDIC
will indemnify the Bank as provided herein to



- 2 -

to each Calendar Quarter the Interest Rate shall be the average equivalent coupon-issue yield on the U.S. Treasury's 52-week Bill auction held immediately prior to the beginning of such Calendar Quarter plus one-half of one percent (0.5%).

4. **Payment of Interest.** Interest will be calculated on a simple interest basis using the actual number of days elapsed during each Calendar Quarter and a calendar year of 365 or 366 days as applicable. The first interest payment shall be due on July 1, 1982 and shall include interest accrued from and including April 3, 1982 to and including June 30, 1982. Thereafter, interest payments for interest accrued during each Calendar Quarter shall be due on the first day of the subsequent Calendar Quarter. If any such date is not a Business Day, payment shall be due on the next Business Day.

5. **Payment of Principal.** Principal on this Note shall be paid in equal annual installments, due on each January 1, beginning in 1983. If such date is not a Business Day, payment shall be made on the next Business Day.

6. **Manner of Payment.** All payments of interest and principal under the terms of this Note shall be made to the Registered Holder of this Note. All such payments shall be made at the principal office of the FDIC specified in Paragraph 15 or the office of the Fiscal Agent specified in the notice of appointment of the Fiscal Agent. At the request of the Registered Holder, payments will be forwarded to the Registered Holder at any address specified in writing to the FDIC or its Fiscal Agent at least fifteen (15) Business Days before the date such payment is to be made. The final payment of interest shall be made only upon presentation of the Note to the FDIC or its Fiscal Agent for cancellation.

7. **Governing Law.** This Note and the rights and obligations hereunder will be governed by the substantive laws of the Commonwealth of Pennsylvania to the extent that Federal law (including statutes, regulations, rulings, and interpretations of the United States or any agency thereof) does not control.

8. **Headings.** The headings and sub-headings of the paragraphs of this Note, except the terms identified for definition in Paragraph 1, are for convenience only and will not affect the meaning or interpretation of this Note or any provision thereof.

9. **Rights and Obligations.** It is expressly agreed by the FDIC that this Note embodies the entire rights and obligations of the Maker and Registered Holder in relation to the subject matter herein, and that no understandings or agreements, oral or written, in relation thereto exist except as herein expressly set forth.

10. **Events of Default; Acceleration of Principal and Interest.** If the FDIC fails to make any payment of principal or interest when due and payable hereunder, and such failure shall continue for fifteen (15) days after written demand for such payment has been delivered to the FDIC by the Registered Holder, or if the FDIC shall fail to observe and perform any of the covenants or agreements of this Note and such failure shall continue for thirty (30) days after written notice thereof has been delivered to the FDIC by the Registered Holder, there shall be an Event of Default. If an Event of Default shall occur and be continuing for five (5) days after the Registered Holder has delivered written notice thereof to the FDIC, the

the extent that the total of such losses exceed
$1,000,000. The provisions of Subsections 10.4
and 10.5 shall not apply to losses as to which
indemnification is claimed under this subpara-
graph (b).

...vided, however, that this indemnity does not include any loss or portion
...eof covered by insurance or any other contract of indemnity, reimbursement
. the like; and provided further that this indemnity does not include any loss
. to any claim or defense which arises out of the same transaction or occur-
...ce as any asset obtained by the Bank pursuant to the Merger.

10.4  Notice and Payment of Claims.  Promptly after receipt of notice of the
...mencement of any action or proceeding, or upon knowledge or discovery of the
...sertion of any claim with respect to which FDIC may be required to indemnify
...reunder, the Indemnitees shall give written notice thereof to the FDIC.  Such
...tice shall be given to the FDIC at the address set forth in Subsection 11.6.
...e FDIC will not be required to indemnify the Indemnitees in any case where
...tice is not timely given.  The Indemnitees shall not make any payment or
...tlement in respect of such a claim, action, or proceeding unless so directed
...writing by the FDIC.  The Indemnitees shall not incur any expense in connec-
...on with any such claim, action, or proceeding, and the FDIC shall not be ob-
...gated to reimburse the Indemnitees for such expenses unless they were incurred
...t the written direction of the FDIC.

10.5  Defense of Claims.  Upon receipt of any timely, written notice to the
...DIC of a claim as specified in Subsection 10.4 herein, the FDIC may, at its

EXHIBIT A



**FEDERAL DEPOSIT INSURANCE CORPORATION**
**PROMISSORY NOTE**

No. C-101
$112,000,000
Floating Rate

April 3, 1982

    The FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"), for value received, hereby promises to pay to the order of THE PHILADELPHIA SAVING FUND SOCIETY ("Registered Holder"), an institution organized and existing under the laws of the Commonwealth of Pennsylvania and having its principal office at 1212 Market Street, Philadelphia, Pennsylvania 19107, or its registered assigns, in lawful money of the United States, on or before January 1, 1989, the principal sum of One Hundred Twelve Million Dollars ($112,000,000) together with interest on the unpaid balance from April 3, 1982 at the Interest Rate (as hereinafter set forth) until said principal sum and all accrued interest are paid.

    1.  Definitions.  For purposes of this Note:

        (a)  "Business Day" means a day other than a Saturday, Sunday, Federal legal holiday, or day on which the principal office of the FDIC or the office of the Fiscal Agent specified in the notice of appointment is closed as required or permitted under State law or the laws of the United States.

        (b)  "Calendar Quarter" means the three (3) month period of each calendar year ending on March 31, June 30, September 30, and December 31.

        (c)  "Fiscal Agent" means any Person appointed by the FDIC as its Fiscal Agent pursuant to Paragraph 2.

        (d)  "Maker" means the FDIC.

        (e)  "Note" means this Promissory Note or any replacement notes.

        (f)  "Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

        (g)  "Registered Holder" means the above-named Registered Holder or its registered assigns.

    2.  Fiscal Agent.  The FDIC reserves the right to appoint any person to act as its Fiscal Agent for the purposes of making payments of principal and interest under Paragraph 6, replacing Notes under Paragraph 11, and registering assignees under Paragraph 13. The FDIC shall give written notice of such appointment to each Registered Holder, at least five (5) Business Days prior to the effective date of the appointment. The FDIC may change Fiscal Agents at any time by following the same procedure.  Once a Fiscal Agent is appointed all notices, demands, and communications regarding those matters specified in Paragraphs 6, 11, and 13, other than notices and/or demands made pursuant to Paragraph 10, shall be delivered to the Fiscal Agent and not the FDIC.

    3.  Determination of Interest Rate.  The Interest Rate for payment of interest on this Note shall be determined quarterly.  With respect

satisfy or settle such claim upon any terms it deems proper.  If a suit
other proceeding is subsequently instituted based on such claim, the Indem-
nees promptly shall give notice as provided in Subsection 10.4, and the FDIC,
its option, may assume the defense of such action or proceeding.  If the FDIC
not exercise its option to assume such defense, then the FDIC's liability,
any, for any expenses of litigation shall extend only to such expenses which
all have been incurred with the FDIC's approval.

## Section 11 - Miscellaneous

11.1  Books and Records of Bank.  The Bank covenants and agrees that during
term of this Agreement the Bank will keep true books of record and account
which full, true, and correct entires will be made of all dealings or trans-
tions in relation to the business and affairs of the Bank.

11.2  Annual Audit.  The Bank covenants and agrees that it will retain cer-
ied public accountants to perform an audit once during each calendar year and
ther, that the results of any such audit shall be promptly furnished directly
the auditing firm to the FDIC.

11.3  Tax Proceedings.  At its own expense, the FDIC will provide assistance
the Bank in proceedings involving any claim that the Merger does not consti-
a tax-free reorganization under Sections 368(a)(1)(G) and 368(a)(3) of the
ternal Revenue Code.

11.4  Successors.  All covenants, representations, warranties, and condi-
ns of this Agreement will be binding on the successors and assigns of the
and the Bank and will inure to the benefit of any successor of the Bank
with the written consent of the FDIC.  Nothing expressed or referred to in

- 21 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by its duly authorized officers on the day and year first above written.

PHILADELPHIA SAVING FUND SOCIETY       FEDERAL DEPOSIT INSURANCE CORPORATION

Anthony J. Nocella                     By: _____
Executive Vice President-Finance           Robert P. Gough
                                           Deputy Director
                                           Division of Bank Supervision

ATTEST:

L. Josephson
VICE PRESIDENT & TREASURER

, Agreement is intended or will be construed to give any Person other than

, FDIC and the Bank and Indemnities any legal or equitable right, remedy, or

, under or in respect of this Agreement, or any provision herein contained,

, being the intention of the parties hereto that this Agreement, the obliga-

, and statements of responsibilities hereunder, and all other conditions and

, visions hereof are for the sole and exclusive benefit of such parties and for

, benefit of no other Person.

  11.5  Headings.  The headings and sub-headings of the Sections contained in

, Agreement, except the terms identified for definition in Section 1 and Sub-

, tions 6.1 and 10.1 are inserted for convenience only and will not affect the

, wing or interpretation of this Agreement or any provision thereof.

  11.6  Notices.  Any notice, request, demand, or other communication to any

, party hereto will be given in writing, and delivered in person against receipt

, refor, or sent by certified mail, postage prepaid, to such party at its

, ress set forth below or at such other address as each such party shall here-

, for furnish in writing to the other party.  If mailed, such notice will be

, ned given when properly delivered to any facility of the United States Postal

, vice.

          FDIC

               Federal Deposit Insurance Corporation
               550 17th Street, N.W.
               Washington, D.C. 20429

               Attention:  Director, Division of
                           Bank Supervision

BANK
> The Philadelphia Saving Fund Society
> 1212 Market Street
> Philadelphia, Pennsylvania 19107

Attention:  President

11.7  Governing Law.  This Agreement and the rights and obligations here-
under will be governed by and construed in accordance with the substantive laws
of the Commonwealth of Pennsylvania to the extent that Federal law (including
statutes, regulations, rulings, or interpretations of the United States or any
agency thereof) does not control.

11.8  Survival of Covenants, Representations, and Warranties.  The cove-
nants, representations, and warranties contained in this Agreement survive the
execution of this Agreement and the consummation of the transactions contem-
plated hereunder.

11.9  Costs and Expenses.  Each of the parties hereto agrees to pay all
costs and expenses which it has incurred in connection with or incidental to the
matters contained in this Agreement, including any fees and disbursements to
accountants and counsel.

11.10  Modification.  No modification, rescission, waiver, release, annul-
ment, or assignment of any part of this Agreement shall be effective except pur-
suant to a written agreement subscribed by the parties hereto or their duly
authorized representatives.