

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED

APR 7 2006

U.S. COURT OF
FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

FRANK P. SLATTERY, JR. AND
LFC NO. 1 CORP., on behalf of
themselves and on behalf of all
other similarly situated shareholders
of Meritor Savings Bank,

       *Plaintiffs,*

     and

STEVEN ROTH AND
INTERSTATE PROPERTIES

       *Intervenors,*

     - v. -

THE UNITED STATES
OF AMERICA,

       *Defendant.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 93-280C

SECOND AMENDED COMPLAINT
OF PLAINTIFFS-INTERVENORS
STEVEN ROTH AND INTERSTATE
PROPERTIES

       Plaintiffs-Intervenors Steven Roth ("Roth") and Interstate Properties (together, "Intervenors"), by their undersigned attorneys, for their complaint against defendant United States of America ("United States"), allege on knowledge as to themselves and upon information and belief as to all other matters, the following:

### Nature of the Action

       1.    This is a suit to recover damages sustained by Intervenors resulting from actions of the Federal Deposit Insurance Corporation (the "FDIC") that led to the seizure of Meritor Savings Bank ("Meritor") and the FDIC's subsequent refusal to pay Meritor shareholders the liquidation surplus to which they are entitled.

418

2.      The moment that Meritor was seized, Meritor's shareholder's obtained a cognizable property interest in the liquidation surplus that remained after the FDIC liquidated the bank.  This interest is non-assignable.

3.      Due to the sale of Meritor's deposits and other assets to Mellon Bank, N.A. ("Mellon") on December 11, 1992, the FDIC, as receiver, collected $181.3 million.  The FDIC also stands to collect the proceeds of any judgment awarded to Meritor from litigation brought derivatively on Meritor's behalf.

4.      Rather than making a distribution to shareholders, the FDIC has retained for itself the entire surplus generated by the liquidation of Meritor.  This action constitutes a taking of Intervenors' interest in the surplus without just compensation in violation of the Fifth Amendment to the United States Constitution.

## Jurisdiction

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).

## Parties

6.      On December 11, 1992, when the Pennsylvania Secretary of Banking seized Meritor and appointed the FDIC as receiver, Roth owned 326,000 shares of Meritor stock.  Roth was a member of Meritor's Board of Directors from 1988 to April 1992.

7.      Interstate Properties is a partnership formed under the laws of the State of New Jersey and has its principal place of business in New Jersey.  Roth is a general partner of Interstate Properties.

8.      At the time that Meritor was seized, Interstate Properties owned 1,382,500 shares of the Meritor stock.

9.      Meritor was organized in 1816 under Pennsylvania law as the Philadelphia Savings Fund Society ("PSFS"). In September 1983, PSFS converted from a mutual savings bank to a stock savings bank, and in 1986 the institution changed its name to Meritor. With more than $3.5 billion in assets, Meritor was, on information and belief, the largest savings bank in the country to be seized.

10.     For purposes of this action, the United States has acted through the FDIC, which was established under the Federal Deposit Insurance Act, as amended, 12 U.S.C. §1811 *et seq.*, for the purpose of, among other things, insuring the accounts of depositors of certain state and federal depository institutions. The FDIC also has been the primary federal regulator of state chartered savings banks. The FDIC was the primary federal regulator of Meritor and insured Meritor's accounts up to $100,000 per depositor.

### Meritor's Acquisition of Western Savings Fund Society of Philadelphia

11.     In or about March 1982, Western Savings Fund Society of Philadelphia ("Western"), a savings bank with 20 branches throughout the Commonwealth of Pennsylvania and with assets of approximately $2.1 billion, was insolvent. At that time, the fair market value of Western's liabilities exceeded the fair market value of its assets by approximately $796 million.

12.     The FDIC, which was the primary federal regulator of Western, recognized that it would have to seize and liquidate Western unless it could find a merger

partner for the institution. The FDIC estimated that it would cost the agency approximately $696 million to pay off the insured depositors of Western.

13.     The FDIC solicited proposals from other financial institutions to acquire the liabilities and assets of Western. In March 1982, in response to the FDIC's solicitation, PSFS, Meritor's predecessor-in-interest, submitted proposals to acquire Western in an FDIC-assisted merger. PSFS's proposals conditioned any acquisition of Western on the FDIC's agreement that "[t]he difference between the liabilities assumed and the total of . . . the market value of the Western assets, less reserves, . . . shall be treated as goodwill and amortized on a straight-line basis over 15 years." At that time, PSFS had 71 branches throughout the Philadelphia metropolitan area and more than $7.4 billion in total assets.

14.     On April 2, 1982, PSFS and Western executed a Plan of Merger, Articles of Merger and Board of Directors' resolutions approving the merger, and submitted an application for the merger to the FDIC.

15.     Later that same day, the FDIC ordered that the application for merger be approved, and that such merger be consummated on April 3, 1982 at 1:00 p.m. In its order, the FDIC expressly found that "action must be taken immediately in order to prevent [Western's] probable failure . . . ."

16.     On April 3, 1982, PSFS and the FDIC entered into a Merger Assistance Agreement ("Assistance Agreement") in connection with the PSFS-Western merger. In that agreement, the parties stipulated that the Secretary of Banking of the Commonwealth of Pennsylvania had determined that Western "is in an unsafe or unsound condition"; that the FDIC "has determined that it is in the best interests of the public and

the depositors and other creditors of Western to provide assistance to facilitate the

Merger"; and that the Board of Directors of the FDIC had determined that the Assistance

Agreement "will facilitate the Merger and will reduce the risk or avert a threatened loss

to the FDIC."

17.     The Assistance Agreement required the FDIC to provide to PSFS,

among other things:

    (a)    a seven-year interest-bearing negotiable amortizing promissory
           note totaling $112,000,000;

    (b)    a seven-year interest-bearing negotiable non-amortizing
           promissory note totaling $108,125,000;

    (c)    an Income Maintenance Agreement for a ten-year period to
           compensate PSFS for the difference between the yield on a
           declining volume of assets and the average cost of funds for U.S.
           savings banks with assets in excess of $500 million;

    (d)    an agreement to purchase from PSFS any covered loan, as defined,
           in default as to payment of principal and/or interest at a price equal
           to the lower of 80 percent of the principal book value or 95 percent
           of its market value; and

    (e)    a payment of $108,125,000.

18.     Contemporaneously with the execution of the Assistance

Agreement, the parties also executed a Memorandum of Understanding (the "1982

MOU") regarding the computation of Income Maintenance Payments under

subsection 6.2 of the Assistance Agreement and the use by PSFS of certain accounting

methods to calculate its capital for purposes of satisfying regulatory capital requirements.

Among other things, the parties expressly agreed in the 1982 MOU that PSFS may treat

"[t]he difference between the liabilities assumed and the total of the market value of the

Western assets, less reserves, . . . as goodwill and amortize[] [the goodwill] on a straight-line basis up to fifteen (15) years."

19.     The 1982 MOU also provided that the FDIC Promissory Note and certain Capital Notes may be treated as assets for purposes of calculating the institution's total capital.

20.     The 1982 MOU, and in particular the agreement to permit PSFS to treat goodwill as an asset for purposes of calculating regulatory capital, was an essential component of the merger agreement.  PSFS would not have consented to acquire the liabilities of Western if the FDIC had not agreed to the 1982 MOU.  Indeed, it would have been irrational for PSFS to have done so without such a contractual commitment from the FDIC.  *See United States* v. *Winstar Corp.*, 116 S. Ct. 2432, 2449 (1996).

21.     The Assistance Agreement and the 1982 MOU, both of which were executed on April 3, 1982, were intended by the parties to be read and construed together.

22.     Section 4.2 of the Assistance Agreement provides that "[t]he Board of Directors of the FDIC has duly authorized the execution of this Agreement and has taken all action necessary for FDIC to enter into and perform this Agreement.  This Agreement constitutes a valid and binding obligation of FDIC, enforceable in accordance with its terms."

23.     As required by Section 4.4 of the Assistance Agreement, on April 3, 1982, Thomas A. Brooks, General Counsel to the FDIC, provided to PSFS a letter in which he opines:

–6–

> Based upon my examination of the law and facts, it is my
> opinion that FDIC has the legal power and authority to
> enter into and perform the foregoing assistance transaction
> and to enter into any agreements and issue any notes as
> may be necessary to consummate such assistance
> transaction. . . . The Merger Assistance Agreement and any
> other agreements and notes necessary to the consummation
> of the transaction, when duly executed by FDIC, will
> constitute the valid and binding obligations of the FDIC
> enforceable in accordance with their terms.

24.     At the time of execution, the terms of the Assistance Agreement and of the 1982 MOU became binding upon the FDIC and PSFS and on their respective successors or assigns.

25.     A news release issued by the FDIC on the day the Assistance Agreement and 1982 MOU were executed and the merger was consummated stated, in part, that "a deposit payoff would have cost the FDIC approximately $696 million" if no merger partner were found for Western "compared to the merger's estimated $294 million present value cost." Thus, according to the FDIC's own estimates, PSFS's agreement to merge with Western pursuant to the terms of the Assistance Agreement and the 1982 MOU saved the government more than $400 million.

26.     Shortly after the merger was approved and the Assistance Agreement and 1982 MOU were executed, the FDIC and PSFS determined that the merger generated approximately $796 million in goodwill. Pursuant to the terms of the merger, PSFS was permitted to treat the goodwill as an intangible asset, and to amortize that asset on a fifteen-year straight-line basis.

27.     The validity of the April 1982 MOU between PSFS and the FDIC was reaffirmed by the FDIC in an October 29, 1984 letter from A. David Meadows,

Associate Director of the FDIC's Division of Bank Supervision, to Anthony J. Nocella,

Executive Vice President of PSFS (the "Meadows Letter"). The letter states that "[t]he

Division of Bank Supervision further confirms that the Memorandum of Understanding,

dated April 3, 1982, executed in connection with PSFS's acquisition of Western

Savings Fund Society remains unchanged and in place." The letter went on to say that,

"in accordance with the Memorandum, PSFS may continue to amortize the goodwill

arising from the Western acquisition over the agreed-upon period."

28.     From 1982 through 1992, Meritor amortized approximately

$543 million of goodwill, writing off more than $53 million annually. At the time of

Meritor's seizure, more than $250 million of unamortized goodwill remained.

Meritor's Conversion to a Stock Savings Bank<br>and Intervenors' Purchases of Meritor Stock

29.     In September 1983, PSFS converted from a mutual savings bank to

a stock savings bank. In connection with the conversion, PSFS issued an Offering

Circular advising prospective purchasers of the terms of the Western acquisition. The

Offering Circular stated, among other things, that "[t]he acquisition of Western was

treated as a purchase for financial reporting purposes. Under the purchase method of

accounting, the assets acquired (which had a book value of $2.111 billion) and the

liabilities assumed (which had a book value of $2.113 billion) in the acquisition of

Western have been recorded at their estimated fair values as of the merger date. The

yield on the former Western assets is being recorded on a level yield basis over the life

of the assets. The resultant difference between the fair value and the book value

($796 million at the date of acquisition), is recorded as an asset."

30.     The Offering Circular further advised prospective purchasers that, "[p]ursuant to an agreement with the FDIC made at the time of the Western acquisition, this asset is being amortized on a straight-line basis over 15 years for FDIC regulatory reporting purposes."

31.     The FDIC reviewed the Offering Circular and authorized its dissemination to the public.

32.     In response to the offering, PSFS sold more than 35 million shares valued at the time at more than $360 million.

33.     In September 1983, Roth purchased 58,470 shares of Meritor stock. During the years 1986, 1987 and 1988, Roth purchased an additional 267,530 shares, for a total of 326,000 shares.

34.     During the years 1986, 1987 and 1988, Interstate Properties purchased a total of 1,382,500 shares of Meritor stock.

35.     Roth and Interstate Properties would not have purchased these shares if the FDIC had not agreed with Meritor to treat the goodwill from the Western acquisition as a regulatory capital asset when calculating Meritor's solvency. Without this agreement, such investments in Meritor would have been unsound and imprudent.

36.     At the time of Meritor's seizure, Roth and Interstate Properties together owned approximately 5 percent of the outstanding stock of the institution.

37.     Intervenors could not have reasonably foreseen that intervening regulatory treatment of goodwill would preclude Meritor from treating goodwill as a regulatory capital asset.

The FDIC Breaches the 1982 MOU by Forcing Meritor
To Accept the Terms of a New Agreement in 1988.

38.     On July 21, 1988, Meritor's Board of Directors signed a subsequent Memorandum of Understanding (the "1988 MOU"). The 1988 MOU raised Meritor's target for primary capital ratio to 6.5%. This target was higher that the regulatory rates required at the time.

39.     The FDIC set the rate this high because it ignored the Western goodwill in calculating Meritor's target, in contravention of the 1982 MOU.

40.     In addition, the 1988 MOU stated that if Meritor failed to reach this capital level by the last day of 1988, it would be required to submit a capital plan to the FDIC and infuse the bank with $200 million in tangible equity capital.

41.     The FDIC forced Meritor to agree to the 1988 MOU by threatening severe regulatory sanctions.

42.     Meritor failed to meet the December, 31 1988 deadline for raising its capital ratio and thus was forced to raise $200 million in capital. The only viable way Meritor found to raise $200 million was to sell 54 of its branches to Mellon.

43.     The sale of the 54 branches led to a rapid decline in Meritor's capital ratio because Meritor's remaining assets earned less income and were riskier than those that Meritor had sold.

44.     The FDIC breached the 1982 MOU when it required Meritor to sign the 1988 MOU or face stronger regulatory action.

45.     On April 5, 1991, Meritor entered into a written agreement with the Pennsylvania Department of Banking and the FDIC (the "1991 Agreement") that

–10–

required Meritor to maintain the ratio of primary regulatory capital to average regulatory assets at a level not less than 8.50 percent and maintain the ratio of total risk-based capital to risk-based assets at a level not less than 10.50 percent. These terms were inconsistent with the 1982 MOU because the FDIC, in requiring the higher regulatory capital ratio, did not treat Western's assets and liabilities as goodwill.

### Meritor's Seizure

46.     On September 29, 1992, the FDIC published a final rule, effective December 19, 1992, that revised the capital requirements for savings banks. Under the newly promulgated regulations, the FDIC would be required to appoint a conservator or receiver for any institution maintaining a "ratio of tangible equity to total assets" at less than 2 percent. The regulations did not specify whether grandfathered goodwill could be treated as an asset in calculating the ratio of tangible equity to total assets.

47.     Meritor officials were concerned about the new regulations' impact, if any, on the Assistance Agreement, the 1982 MOU and the 1988 MOU. If goodwill were included in the tangible equity calculations, Meritor's ratio of tangible equity to total assets would exceed 4 percent. If goodwill were not included, the ratio would approximate 1 percent and leave the institution vulnerable to seizure.

48.     The uncertainty regarding the FDIC's treatment of Meritor's goodwill under the new regulations prompted Roger S. Hillas, Chairman of Meritor, to ask the FDIC in writing whether the new rule would permit Meritor to continue to treat goodwill as an asset for purposes of calculating its tangible equity, as provided in the Assistance Agreement and 1982 MOU. This inquiry is reflected in an October 14, 1992

–11–

letter from Hillas to Paul G. Fritts, FDIC Executive Director, Division of Supervision and Resolutions.

49.     The local media widely reported that the FDIC's interpretation of the term "tangible equity" could lead to the appointment of a conservator or receiver for Meritor. For example, on October 24, 1992, the *Philadelphia Inquirer* reported: "At issue is whether Meritor can continue to count about $253 million in intangible 'goodwill' on its balance sheet, something the regulators have allowed it to do for decades. The answer could determine whether the institution survives for more than a few months."

50.     The uncertainty regarding the FDIC's treatment of goodwill caused many depositors to withdraw their funds from the institution. FDIC largely could have prevented the withdrawal of deposits from Meritor if it had announced that it would honor its contractual commitment and permit Meritor to include goodwill as an asset for purposes of calculating its regulatory capital.

51.     The FDIC maintained that the decision to include or exclude goodwill in calculating Meritor's regulatory capital under the new regulation was in the discretion of the agency. Robert Miailovich, associate director of the FDIC's Division of Supervision was quoted by the *Philadelphia Inquirer* on October 24, 1992, as stating that "[i]t's a matter of interpreting the regulations . . . . Since we wrote the regulations, I suppose there is some leeway for us to determine what we're going to do."

52.     On December 9, 1992, the FDIC issued a Notification to Primary Regulator (Pennsylvania Department of Banking) of Findings (FDIC-92-354a) in which the FDIC concluded, *inter alia*, that Meritor "is operating with inadequate capital."

FDIC's calculations of Meritor's capital in its December 9, 1992 Notification excluded Meritor's $253 million in unamortized goodwill, and further excluded approximately $46 million resulting from the sale of a Florida-based savings and loan subsidiary.

53.     On December 11, 1992, the FDIC informed Meritor, by letter from Stanley J. Poling, Director of FDIC Division of Supervision, to Roger S. Hillas, Chairman of Meritor, that the FDIC had determined that the regulatory definition of tangible equity excluded the $253 million of goodwill on Meritor's books.

54.     In reliance on FDIC's findings and recommendations, on December 11, 1992, Sarah W. Hargrove, the Pennsylvania Secretary of Banking, took possession of the business and property of Meritor, and appointed the FDIC as receiver. In finding that the capital of Meritor "has been significantly impaired," Hargrove relied upon the FDIC's decision to exclude Meritor's goodwill from all capital calculations.

55.     This action constituted an addition breach of the 1982 MOU.  If the FDIC had complied with the 1982 MOU, the Western goodwill would have been counted as an asset and the institution's tangible equity ratio would have easily exceeded the 2 percent requirement that was to become effective eight days later pursuant to the Federal Deposit Insurance Corporation Improvement Act of 1991.

56.     If the FDIC's December 9, 1992 Notification to Primary Regulator of Findings had included both the capital raised from the sale of the Florida-based savings and loan subsidiary and Meritor's $253 million in unamortized goodwill, and otherwise recognized Meritor's goodwill as a regulatory capital asset, Meritor would not have been seized.

57.     On December 11, 1992, the same day it was appointed receiver of the institution, the FDIC approved the assumption of Meritor's deposits by Mellon. Mellon paid a premium of $181.3 million for the right to receive Meritor's deposits and certain of its assets and liabilities.

58.     The United States, acting through the FDIC, repudiated Meritor's contractual right to treat more than $250 million in unamortized goodwill as regulatory capital, thereby causing Meritor to be seized and its assets sold. Meritor in essence ceased to exist after its seizure and liquidation. The FDIC's breach and ensuing seizure of Meritor thus rendered Intervenors' investments in Meritor worthless.

59.     The moment that Meritor was seized its shareholders obtained a cognizable property interest in receiving a pro-rata share of any surplus arising from the FDIC's liquidation of Meritor.

60.     Due to the receipt of $181.3 million from Mellon, a surplus existed and the shareholders', including Intervenors', property interest in their pro-rata shares of such surplus accrued.

61.     The FDIC has not paid Intervenors their pro-rata share.

62.     In or about September 1993, six months after this action was commenced and nearly a year after Meritor was seized and liquidated, Roth and Interstate Properties sold their holdings of more than 1.7 million shares for approximately three cents per share.

### Intervenors' Interest in This Litigation

63.     On or about April 12, 1993, Slattery wrote a letter to Roth suggesting a lawsuit against the United States on behalf of all shareholders of Meritor as

–14–

of December 11, 1992 for claims arising out of the seizure of Meritor. The proposed class included Intervenors. Slattery attached a letter and a draft complaint from proposed counsel.

64. Slattery requested that Roth pay $50,000 to join in the lawsuit, and over the next few months forwarded letters from Slattery and counsel discussing the "war chest" needed to bring and maintain the lawsuit. Slattery indicated that his company was not willing to spend more than $50,000 itself on the litigation. Slattery told Roth that if he paid the $50,000, he would "be in a position to make decisions" regarding the litigation.

65. Slattery and LFC No. 1 Corp. (collectively "Plaintiffs") commenced this action on or about May 4, 1993, asserting claims on behalf of a class consisting of all Meritor shareholders as of December 11, 1992, the date Meritor was seized, and derivatively on behalf of Meritor. Intervenors were within the pleaded shareholder class. The complaint alleged, among other things, that the FDIC's actions constituted a taking of property in violation of the Fifth Amendment, entitling the "shareholder" class to recover damages.

66. After receiving additional solicitations for money, on or about August 19, 1993, Intervenors paid $50,000 to counsel prosecuting the action.

67. On October 22, 1996, Plaintiffs abandoned the class on whose behalf the action was brought by moving to amend their complaint to redefine the class to include only shareholders as of the date of judgment in this action. This new proposed class did not include Intervenors. At no time did Intervenors consent to the amendment

–15–

of the complaint, to their exclusion from the class represented, or to termination of the protection of their interests by the putative class representative.

68.     Subsequently, Intervenors moved to intervene in this action. Intervention was granted by this Court by Order dated February 12, 1997.

69.     On April 24, 1998, this Court entered a Scheduling Order that established a timeline for the trial of Plaintiffs' claims.  Because Intervenors were no longer part of Plaintiffs' pleaded class, the determination of Intervenors' claims was deferred until after the court decided Plaintiffs' claims.

70.     On August 14, 2002 the Court issued a decision finding the United States liable on Plaintiffs' contract claims.  On February 10, 2006, the Court awarded $371,733,059 in damages on various theories of injury.

71.     On March 9, 2006, Plaintiffs filed a Proposed Final Order which asks this Court to dismiss with prejudice its remaining class claims and Fifth Amendment takings claims.

### FIRST CLAIM FOR RELIEF
Taking of Property in Violation of the
Fifth Amendment to the United States Constitution
(Taking of Intervenors' Interest the 1992 Liquidation Surplus)

72.     The allegations contained in paragraphs 1 through 71 are incorporated herein by reference.

73.     The FDIC's breach led to the seizure of Meritor and liquidation of its assets, and to the effective elimination of Intervenors' investments.  The day the FDIC was appointed receiver of Meritor, it sold Meritor's deposits to Mellon, which paid a premium of $181.3 million for the right to receive the deposits.

74.     Under 12 U.S.C. § 1821(d)(11)(A), the FDIC was required to distribute to shareholders the surplus remaining after payment of other claims set forth in that section.  The statutory right to receive such surplus accrued to shareholders on December 11, 1992, the date the FDIC seized and liquidated Meritor.  The seizure of Meritor created a cognizable property interest on that date for their pro-rata share of any liquidation surplus.

75.     The FDIC has failed to distribute to Intervenors their proportionate share of the funds the agency obtained through the sale of Meritor's assets.  The FDIC has instead retained these funds for its own use, thereby causing injury to the Intervenors.

76.     The FDIC's failure to provide to Intervenors their proportionate share of the surplus from the $181.3 million constitutes a taking of Intervenors' property without just compensation in violation of the Fifth Amendment to the United States Constitution.

77.     Intervenors did not assign their takings claims when they sold their Meritor stock nearly one year after the takings claims accrued.

### SECOND CLAIM FOR RELIEF
Failure To Distribute the 1992 Liquidation Surplus Under
12 U.S.C. § 1821 ($181.3 Million)

78.     The allegations contained in paragraphs 1 through 77 are incorporated herein by reference.

79.     Under 12 U.S.C. § 1821(d)(11)(A), the FDIC was required to distribute to shareholders the surplus remaining after payment of other claims set forth in

that section.  The statutory right to receive such surplus accrued to shareholders on December 11, 1992, the date the FDIC seized and liquidated Meritor.

80.     The FDIC has failed to pay Intervenors their proportionate share of the surplus remaining from the $181.3 million received from Mellon after satisfaction of the claims set forth in 12 U.S.C. § 1821(d)(11)(A).  The FDIC instead has retained these funds for itself, thereby causing injury to Intervenors.

81.     Intervenors did not assign this claim when they sold their share in 1993.

### THIRD CLAIM FOR RELIEF
Declaration of Intervenors' Rights to Liquidation Surplus Under 12 U.S.C. § 1821 and Creation of a Constructive Trust (Funds Received as a Result of Derivative Litigation)

82.     The allegations contained in paragraphs 1 through 81 are incorporated herein by reference.

83.     The proceeds of any award from a successful derivative litigation prosecuted on Meritor's behalf should be paid to the FDIC as receiver of Meritor.

84.     Under 12 U.S.C. § 1821(d)(11)(A), the FDIC is required to distribute to shareholders the surplus remaining after payment of other claims set forth in that section.  The statutory right to receive such surplus accrued to shareholders on December 11, 1992, the date the FDIC seized and liquidated Meritor.

85.     The FDIC has so far failed to provide to Intervenors their proportionate share of any surplus remaining after satisfaction of the claims set forth in 12 U.S.C. § 1821(d)(11)(A) and has indicated by its actions in this litigation that it does not intend to do so in the future.

86.     The FDIC is obligated to distribute to all shareholders of Meritor who owned shares on December 11, 1992 any surplus remaining after payment of other claims set forth in 12 U.S.C. § 1821(d)(11)(A) including surpluses obtained after the initial liquidation as a result of a successful derivative litigation on Meritor's behalf.

87.     A constructive trust is necessary to prevent the injustice that would occur if a subsequent purchaser of Meritor, who purchased his or her shares after December 11, 1992, were to recover pro-rata shares of an eventual recovery in this action, thus depriving Intervenors of their ability to recover for the loss they suffered as a result of the FDIC's breach of the 1982 MOU and subsequent seizure of Meritor.

88.     In addition, because of Intervenors' financing of the present action before they were forced to intervene, the retention of Intervenors' pro-rata share in any recovery by another party would be wrongful.

89.     This court has the equitable power to direct the FDIC to pay Intervenors' their pro-rata share of any recovery in this action by imposing a constructive trust on such pro-rata share.

### FOURTH CLAIM FOR RELIEF
#### Intended Beneficiaries of Contract

90.     The allegations contained in paragraphs 1 through 89 are incorporated by reference.

91.     Intervenors, among others, are the intended beneficiaries of the April 3, 1982 Assistance Agreement and 1982 MOU between PSFS and the FDIC. Intervenors would not have purchased such stock if PSFS/Meritor did not have the contractual right to treat the deficit net worth inherited from Western as an asset for

regulatory capital purposes because PSFS/Meritor would not have been a sound, solvent financial institution.

92.    The FDIC has breached its contract with PSFS/Meritor by refusing to allow goodwill to be treated as an intangible asset for regulatory capital purposes and injured investors as the intended beneficiaries of the 1982 MOU.

### PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS-INTERVENORS RESPECTFULLY PRAY:

(a)    That Intervenors be awarded just compensation for the taking of their proportionate share of the surplus remaining from the December 11, 1992 liquidation of Meritor's assets;

(b)    That, in the alternative, Intervenors be awarded their proportionate share of the surplus remaining from the December 11, 1992 liquidation of Meritor's assets under 12 U.S.C. § 1821(d)(11)(A);

(c)    That the Court award Intervenors pre-judgment interest on the damages they sustained as a result of the FDIC's unconstitutional taking of Intervenors' interest in the liquidation surplus resulting from the liquidation of Meritor's assets;

(d)    That the Court impose a constructive trust on Intervenors' pro-rata share of the surplus remaining from the liquidation of Meritor's assets and future proceeds from any successful derivative litigation on Meritor's behalf;

(e)    That the Court award Intervenors declaratory relief that under 12 U.S.C. § 1821(d)(11)(A), Meritor shareholders as of December 11, 1992, the date of liquidation, are entitled to receive their pro-rata share of any liquidation surplus and subsequent purchasers are not;

–20–

(f)     That the Court award Intervenors their costs and attorneys' fees as

allowed by law; and

(g)     That the Court grant such other relief as the law and evidence may

justify, and that the Court deems just and proper.

Dated: April 7, 2006

Respectfully submitted,

*Steven W. Thomas*

Steven W. Thomas
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067
(310) 712-6600
*Attorneys for Intervenors Steven Roth*
*and Interstate Properties*

Richard J. Urowsky
Bradley P. Smith
Robert S. Landy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000
*Of Counsel*

## AFFIDAVIT OF SERVICE

DISTRICT OF COLUMBIA )
: ss.:
CITY OF WASHINGTON   )

Hiromi Koyama, being duly sworn, deposes and says that she is over the

age of 18, and not a party to this action and that on the 7th day of April, 2006, served true

copies of the Second Amended Complaint of Plaintiff-Intervenors Steven Roth and

Intestate Properties upon:

> Thomas M. Buchanan
> Winston & Strawn LLP
> 1700 K Street, N.W.
> Washington, D.C. 20006-3817
> (By Hand)

> F. Jefferson Hughes
> Trial Attorney
> Commercial Litigation Branch
> Civil Division
> Department of Justice
> 1100 L Street, N.W.
> 8th Floor
> Washington, D.C. 20530
> (By Hand)

DERRICK C. WHITE
Notary Public of District of Columbia
My Commission Expires July 14, 2006

Jeffrey B. McCarron, Esq.
Swartz, Campbell & Detweiler
1601 Market Street
34th Floor
Philadelphia, PA  19103
(By Overnight Courier)

Hiromi Koyama

Sworn to before me this
7th day of April, 2006

Notary Public

**DERRICK C. WHITE**
**Notary Public of District of Columbia**
**My Commission Expires July 14, 2006**